Maurice VerStandig, Esq.
Nevada Bar No.: 15346
THE VERSTANDIG LAW FIRM, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Telephone: (301)444-4600
Facsimile: (301)576-6885
Email:  mac@mbvesq.com
*Counsel for the Ms. Ball
and Mr. Prignano*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | | |
|---|---|---|
| ALYSSA BALL | * | |
| | * | |
| and | * | |
| | * | |
| JOHN PRIGNANO | * | |
| | * | Case No. 2:20-cv-888 |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| SKILLZ INC. | * | |
| | * | |
| Defendant. | * | |
| | * | |

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Come now Alyssa Ball ("Ms. Ball") and John Prignano ("Mr. Prignano") (Ms. Ball and Mr. Prignano being collectively known as the "Plaintiffs" and each sometimes being known as a "Plaintiff"), by and through undersigned counsel, and as and for their complaint (the "Complaint") against Skillz Inc. ("Skillz" or the "Defendant") state as follows:

### Introduction

1.      This case concerns the Defendant's operation of an illegal gambling racket within the United States and, more particularly, within the States of Nevada and Texas; the Defendant's



failure to implement appropriate security measures in its operation of its illicit games; and the Plaintiffs' loss of over a million dollars to an individual the Defendant knew to be cheating in such games.

2.      When Ms. Ball had the temerity to inquire about being refunded monies lost to a known cheater in the Defendant's games, a bizarre set of events unfolded whereby the Defendant blocked Ms. Ball's access to the Defendant's games, and Ms. Ball contacted the Defendant's chief executive officer.

3.      When contacted by Ms. Ball, the Defendant's chief executive officer – a 36-year-old man – learned Ms. Ball to be 19-years-old and promptly inquired "Do you like older guys?" and endeavored to arrange a rendezvous with her in Las Vegas, Nevada.

4.      Thereafter, the Defendant impounded the approximately $28,000.00 of monies belonging to Ms. Ball, indicated it would not refund her the approximately $650,000.00 in monies she lost to an individual the Defendant knew to be cheating, and created a pretextual and counterfactual narrative to justify expelling Ms. Ball from participation in its illegal games.

5.      At the same time, the Defendant, apparently either unwilling or unable to produce a Porsche Boxster Mr. Prignano had won on its platform,  impounded approximately $286,000.00 of monies belonging to Mr. Prignano, indicated it would not refund him the approximately $950,000.00 in monies he lost in games against an individual the Defendant knew to be cheating, and created a similar pretextual and counterfactual narrative to justify expelling Mr. Prignano from participation in its illegal games.

6.      This suit is brought so Ms. Ball and Mr. Prignano may recover the monies the Defendant allowed to be swindled by a cheater, so they may recover other monies lost to other cheaters the Defendant failed to timely detect despite its promises to do so, so they may recover



the monies of theirs being wrongfully held by the Defendant, and so an appropriate declaratory judgment may be entered to prevent the Defendant – an unlicensed operator of illegal gambling activities – from causing further harm to the American citizenry.

**Parties**

7.      Ms. Ball is a natural person who is a citizen of the State of Nevada by virtue of her ongoing residency therein.

8.      Mr. Prignano is a natural person who is a citizen of the State of Texas by virtue of his ongoing residency therein.

9.      The Defendant is a Delaware corporation with its principle place of business being in the State of California.

**Jurisdiction & Venue**

10.      This Honorable Court enjoys jurisdiction over the matter *sub judice* pursuant to the allowances of Section 1332 of Title 28 of the United States Code, as this is a dispute between citizens of different states in which the matter in controversy exceeds $75,000.00.

11.      Venue is properly laid in the Honorable Court pursuant to Section 1391(b) of Title 28 of the United States Code because a substantial part of the events giving rise to the claims stated herein occurred through Ms. Ball's play of the Defendant's games in Clark County, Nevada.

**General Allegations: 21 Blitz**

12.      The Defendant operates various app-based online games in which individuals wager money against one another to partake in contests, with each contest typically having a duration of three minutes or less.



COMPLAINT AND DEMAND FOR TRIAL BY JURY - 3

13.     The Defendant aggregates the wagers of the two competing parties and deducts from it a portion – typically equal to Sixteen and Two Thirds Percent (16.67%) – as an operation fee or, in colloquial parlance, a "rake."

14.     One of the Defendant's most popular games is 21 Blitz, which is available for download from the "App Store" maintained by Apple Inc. and made available on the operating system of all, or nearly all, smartphones manufactured by Apple Inc., including the popular iPhone series of smartphones.

15.     In a game of 21 Blitz, a full deck of cards is exposed one card at a time, in a putatively random order, with the user then being tasked with placing each card, upon it becoming exposed, in one of four columns.

16.     The objective of 21 Blitz is to arrange the cards so that those in each column add up to 21, being a riff on the classic casino game of blackjack; once the cards in a given column add up to 21, the column is "cleared" and becomes available for the placement of new cards.

17.     If a player in 21 Blitz places cards in a column such that their cumulative value exceeds 21, the game declares the player has "busted" (utilizing the classic blackjack verbiage) and the subject column clears; if a player busts three times before clearing the entire deck, the game ends; otherwise, the game ends when all 52 cards have been distributed.

18.     21 Blitz offers two alternative methods of clearing a column.

19.     The first alternative method is whereby a column clears if a player amasses five cards in that column without exceeding the sum of 21 (being a riff on the "6-card Charlie" rule of certain games of blackjack, especially those of an older vintage).



20.     The second alternative method is whereby the placement of the jack of spades or the jack of clubs (literally, the two "black jacks") will automatically clear a column without regard to the sum of cards contained therein.

21.     A player's score in 21 Blitz is computed based on (i) the number of cards the player was able to clear; (ii) the number of stacks the player was able to clear; (iii) the amount of time under three (3) minutes the player took the complete the game; and (iv) some combination of other factors the Defendant does not disclose including, upon information and belief, at least one factor unknown to the Defendant itself on account of the Defendant's utilization of software developed by a third party.

22.     Whichever of the two (2) players in a given contest of 21 Blitz has a higher score is awarded the monies wagered by both players, less the Defendant's rake.

23.     The order in which the cards are dealt in a game of 21 Blitz is putatively random, meaning there are various permutations and combinations of cards that will force a player to "bust" several times in a row; if, by way of anecdote only, of the first twelve (12) cards distributed in a given game, eight (8) are face cards or tens, and the remaining four do not include any aces, the player will likely be compelled to bust three columns in rapid duration and end the game with a rather low score.

24.     Other games operated by the Defendant include "13 Card Tournament," an almost-precise aping of the form of "Chinese Poker" exposed for play in various Nevada casinos; "Solitaire Cube," a game in which two people play solitaire and are scored based on the number of cards they are able to move, the amount of time they expend, and the number of turns of the deck they utilize; and "Texas Solitaire," a game in which cards are "dealt" in pairs of two and a

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 5

traditional Texas hold 'em board is unveiled with the deal of each duo of cards, as players are encouraged to arrange the dealt cards to make the best possible series of video poker hands.

**General Allegations: Cheating Policy**

25.     The Defendant's website has advertised, at all times relevant, "Skillz technology and teams ensure that each tournament provides the same circumstances to each player. Software and fraud prevention teams also monitor gameplay to prevent cheating and ensure competitions are fair."

26.     The Defendant has also long promised players that if cheating is detected in a match, the victimized player will receive a full refund of her or his entry fee for the subject match.

27.     Despite this assurance, the Defendant has, from time to time, detected cheating in connection with its various games.

28.     It has been the pattern and practice of the Defendant, upon discovering cheating, to notify impacted players who lost contests to an individual engaged in such cheating, and to refund such victims the monies they lost in those given contests.

29.     When this would occur, impacted victims would sometimes receive an e-mail, from the Defendant, typically reading, *inter alia*, "In our continuing effort to keep the system safe, we identified a user or users that you were matched against that violated our Terms of Service. As a result, we have made the following changes on your account. We have credited," with a dollar figure then being inserted, followed by the word "Cash."

30.     By way of anecdote only, on April 16, 2019, the Defendant wrote to Mr. Prignano, *inter alia*, "If we find a confirmed cheater we will refund entry fees and reach out to let a player know."



31.     Members of the Skillz gaming community, including Ms. Ball and Mr. Prignano, came to rely on Skillz to both operate a platform devoid of cheating but, too, to follow through with this course of conduct when cheating is detected.

32.     Had Ms. Ball and Mr. Prignano not been confident any losses to individuals who cheated would, in turn, be refunded, they would not have continued playing the Defendant's games.

### General Allegations: Ms. Ball's Play of the Defendant's Games

33.     Commencing in or about August 2019, Ms. Ball began playing various of the Defendant's games, with the majority of her time and effort being devoted to 21 Blitz.

34.     Ms. Ball initially lost approximately $50,000 playing the Defendant's games, but was able to form effective strategies in so doing, ultimately becoming a generally profitable player.

35.     Ms. Ball would wager, on average, hundreds of dollars on each game of the Defendant's in which she partook, with each game typically having a duration of between one (1) and two (2) minutes.

36.     In light of Ms. Ball's election to play the Defendant's games at high stakes, there was a relatively small pool of players against whom she would regularly play, with one such individual being herein designated as "John Doe."

37.     After John Doe participated in several matches against Ms. Ball, Skillz discovered John Doe to be cheating in such matches, through his manipulation of Skillz' 21 Blitz app.

38.     Skills then sent an e-mail to Joe Doe indicating, *inter alia*: "We are now informing you that some items in your account have been consistent with our internal risk patterns… Usually in this situation we permanently ban the user. Any winnings earned from violating our Terms of

Service have been forfeited. Please consider this your only warning. I can reopen your main account, but you must write back explicitly agreeing to our Terms of Service…"

39.    Skillz thus deviated from its usual course of conduct and, in lieu of banning John Doe from participating in its games, permitted John Doe to continue playing in such games.

40.    In various matches against John Doe, both before and after Skillz sent John Doe the foregoing e-mail, Ms. Ball lost to John Doe the approximate sum of $650,000.

### General Allegations: Ms. Ball's Complaint, Suspension and Expulsion

41.    When Ms. Ball learned of John Doe's cheating, she inquired of Skillz when she would be receiving a refund of monies lost to John Doe in cheated matches.

42.    Skillz demurred to Ms. Ball's request, indicating it would not be refunding her, despite its pattern and practice of having done so with smaller sums of money in the past.

43.    Skillz then suspended Ms. Ball's account for the pretextual purpose of obtaining verification of Ms. Ball's identity and the veracity of her play.

44.    When Ms. Ball promptly sent Skillz verification of her identity and the veracity of her play – and went so far as to offer to travel to San Francisco to present proof of the same in person – Skillz kept her account suspended without explanation.

45.    At this juncture, Ms. Ball located Andrew Paradise ("Mr. Paradise"), the founder and chief executive officer of Skillz, through Instagram, a social media platform.

46.    Mr. Paradise, whose Instagram account has restricted access, accepted Ms. Ball's request for access and sent her a message reading "Have we met somewhere? I feel like I'd remember as you're too beautiful to be forgettable. Haha and if we haven't met, we should, I'm in Vegas all the time."

47.    Ms. Ball then introduced herself as a consumer of Skillz' games.



48.     Mr. Paradise then indicated he "just got out of a long term relationship" before inquiring of Ms. Ball her age.

49.     Ms. Ball truthfully indicated that she is 19-years-old, to which Mr. Paradise responded "I'm 37," followed by his insertion of an emoji modeled after one of the three wise monkeys whose eyes are concealed.

50.     Mr. Paradise then immediately inquired, "do you like older guys?," before adding, "…would love to meet you in Vegas maybe later in February[.] But have to crash for now – we're doing a ribbon cutting ceremony with Steve [Y]oung, Jerry [R]ice and the mayor of Miami tomorrow…"

51.     Some dialogue ensued, with Ms. Ball sharing her frustration having her account suspended without explanation and asking if Mr. Paradise would call her to discuss; Mr. Paradise, in turn, proposed the two speak via a video chatting platform, only to ultimately call off the conversation, writing, "Ah my team doesn't want me to do this so we shall have to postpone. They're concerned that you are part of a ring of known cheating/fraud people involver a user named prignum."

52.     Shortly thereafter, Ms. Ball's account with Skillz was permanently terminated, the approximately $28,000 balance of that account was impounded by Skillz, and she was notified Skillz would neither tender to her that account balance nor the monies she lost to an individual Skillz itself identified as a known cheater.

53.     Ms. Ball has never cheated another user in a Skillz game, is not part of a "fraud ring," and believes these assertions to be a pretextual and demonstrably counterfactual campaign of Skillz to (i) avoid paying her the approximately $650,000 out of which she was cheated by



John Doe; and (ii) minimize the fallout of its chief executive officer having intimated a desire to have a rendezvous, in Las Vegas, with a 19-year-old consumer of Skillz.

### General Allegations: Mr. Prignano's Play of the Defendant's Games

54.     Commencing in or about December 2018, Mr. Prignano began playing the Defendant's games, also dedicating the majority of his efforts to 21 Blitz.

55.     Mr. Prignano is an elite eSports gamer, and welcomed the opportunity to wager sums of money on his play against other individuals on a putatively honest and fair gaming platform.

56.     Mr. Prignano registered for the Defendant's apps under the username "prignum" (being the individual referenced in Mr. Paradise's discussion with Ms. Ball *supra*).

57.     Mr. Prignano initially lost approximately $5,000.00 to $7,000.00 playing the Defendant's games before gaining a mastery of 21 Blitz, and then proceeded to earn significant monies through his play of over 70,000 games of 21 Blitz, with most such games being played for several hundred dollars apiece.

### General Allegations: Mr. Prignano's Attempted Redemption of Rewards Points

58.     In playing the Defendant's games, Mr. Prignano – like Ms. Ball and all other players – would accrue nominal rewards points based on the stakes and frequency with which he played; Mr. Prignano paid careful attention to these points and the prizes for which they could be supposedly redeemed.

59.     In or about May 2019, Mr. Prignano noticed he was accruing rewards points rapidly, based on his frequent play and the high stakes nature of his play; this led Mr. Prignano to consider what prizes he may aspire to redeem if his play continued, and he commenced to endeavor to earn a new Porsche Boxster.

60.     By August 2019, Mr. Prignano had accrued enough rewards points to redeem the new Porsche Boxster.

61.     When Mr. Prignano endeavored to redeem the car, the Defendant immediately commenced erecting obstacles, demanding he earn additional rewards points to redeem the car, informing him it was actually to be a used car, demanding verification of his play, and otherwise stalling.

62.     Meanwhile, the Defendant – seemingly caught off-guard someone actually could earn enough points to garner a Porsche Boxster – commenced taking steps to make it more difficult for others to do so, raising the membership point threshold for redemption by approximately 66% without notifying its user base of this change in terms and, in essence, moving the proverbial goal line in so doing.

63.     After more than five months, the Defendant still had not delivered to Mr. Prignano a Porsche Boxster – whether new, used, or otherwise.

64.     At this point, the Defendant undertook a strategic effort to avoid its obligation to Mr. Prignano with regard to the Porsche Boxster and, too, to seize his then-current account balance, which was a staggering $286,000.00 or so.

65.     In so doing, the Defendant lodged similar – and equally counterfactual – allegations against Mr. Prignano that it had against Ms. Ball, albeit with some added claims of a uniformly untrue (and, in one case, conceptually impossible) nature.

**General Allegations: Mr. Prignano Cheated by Same Individual as Ms. Ball**

66.     With Mr. Prignano and Ms. Ball both being amongst the relatively small pool of "high rollers" on the Defendant's 21 Blitz app, Mr. Prignano also played numerous matches against John Doe in which Mr. Prignano was cheated.



67.     Mr. Prignano lost approximately $950,000.00 in entry fees in matches he played against John Doe.

68.     This followed Mr. Prignano losing approximately $100,000.00 to another individual understood to be cheating ("John Doe #2") slightly before the at-issue matches with John Doe.

69.     On multiple occasions, Mr. Prignano informed the Defendant he suspected John Doe to be cheating.

70.     Despite this information, Skillz continued to boast of the integrity of its platform and continued to pair Mr. Prignano in matches against John Doe.

71.     Mr. Prignano later learned yet another individual ("John Doe #3") was cheating on the platform, taking from Mr. Prignano approximately $250,000.00.

72.     Mr. Prignano naively assumed the first instance of Skillz failing to make him whole for losses to John Doe #2 was an administrative oversight; he now understands Skillz was simply unwilling to honor its guarantee to players when any appreciable sum of money was implicated.

73.     Mr. Prignano now further understands Skillz was not merely ignoring his concerns; Skillz was, in fact, confronting John Doe about cheating on the platform but nonetheless permitting John Doe to continue playing against Mr. Prignano and Ms. Ball.

### Notification of Intent to Amend

74.     Mr. Prignano was present in the State of Texas for the majority of the games of 21 Blitz in which he partook.

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 12

75.     Mr. Prignano intends to seek recourse under the Deceptive Trade Practices-Consumer Protection Act set forth in Section 17.41, *et seq.* of the Texas Business and Commerce Code.

76.     Section 17.505 of the Texas Business and Commerce Code requires a defendant be afforded notice at least 60 days before such a suit is brought.

77.     Mr. Prignano will be henceforth furnishing the Defendant with the requisite statutory notice and is hopeful there will be no need to bring suit under this consumer statute as the Defendant will see fit to remedying the issues outlined by Mr. Prignano.

78.     However, should such a remedy not be entertained by the Defendant, Mr. Prignano intends to amend this Complaint at such a time as the 60 day notice period has elapsed, and herein makes note of his intent to do so solely to avoid any suggestion such amendment will somehow cause prejudice to the Defendant.

79.     Ms. Ball, having been present in Nevada for the majority of the 21 Blitz games she played, seeks recourse *infra* under Nevada's consumer protection laws, which have no such notice requirement, though she did make demand on the Defendant prior to bringing this suit.

**Spoliation**

80.     Specifically, Ms. Ball made demand on the Defendant on May 7, 2020.

81.     As part of Ms. Ball's demand to the Defendant, she notified the Defendant of its obligation to not destroy evidence pertinent to her allegations including, *inter alia*, "all written communications with Ms. Ball…"

82.     Notwithstanding Ms. Ball's notice to the Defendant of its need to abstain from destroying evidence, shortly after the Defendant received Ms. Ball's demand such a destruction occurred.



83.     Specifically, on or about May 14, 2020, Mr. Paradise deleted the whole of his Instagram conversation with Ms. Ball, in which he had inquired of her interest in "older men" and endeavored to arrange a thinly-veiled sexual rendezvous with her in Las Vegas.

84.     It is not presently known what other records the Defendant and its agents have destroyed, but there is appreciable concern they have used the time afforded by Ms. Ball's settlement demand not to entertain a resolution of this case but, rather, to destroy the evidence tending to incriminate their actions herein and, as noted *infra*, their actions in contravention of federal and state criminal law.

**Criminality**

85.     As noted *infra*, the actions of the Defendant herein violate both federal and state gaming laws.

86.     At no time during their play of games on the Defendant's platform were Ms. Ball and/or Mr. Prignano aware of the criminal nature of the games they were playing.

87.     Rather, inasmuch as the games were offered via Apple Inc.'s widely-policed App Store, and monetary transactions occurred through reputable third-party vendors such as PayPal, Ms. Ball and Mr. Prignano suffered the delusion of believing they were engaged in lawful gaming activity.

88.     Not until after Ms. Ball and Mr. Prignano were expelled from the Defendant's platform did they learn of the illegal nature of the Defendant's business.

**Count I – Consumer Fraud (False Representation)**
**(Brought Solely by Ms. Ball)**

89.     Ms. Ball incorporates and realleges each and every foregoing paragraph of this Complaint as though fully set forth herein.

90.     The Defendant's website has advertised, at all times relevant, "Skillz technology and teams ensure that each tournament provides the same circumstances to each player. Software and fraud prevention teams also monitor gameplay to prevent cheating and ensure competitions are fair."

91.     The Defendant knew, for a period of at least three months, John Doe was cheating in contests hosted by the Defendant, yet continued to make the foregoing statement on its website, in contravention of Section 598.0915(15) of the Nevada Revised Statutes.

92.     Ms. Ball has been damaged in the sum of $650,000.00, being the monies she lost to John Doe whose cheating was not prevented by the Defendant despite its fraudulent representation to the contrary.

WHEREFORE, Ms. Ball respectfully prays this Honorable Court (i) enter judgment in her favor, and against the Defendant, in the sum of Six Hundred Fifty Thousand Dollars and No Cents ($650,000.00) as and for actual damages, pursuant to the allowances of Section 41.600(3)(a) of the Nevada Revised Statutes; (ii) award Ms. Ball her reasonable attorneys' fees and costs in this case, and reduce the same to a judgment in her favor, and against the Defendant, pursuant to the allowances of Section 41.600(3)(c) of the Nevada Revised Statutes; and (iii) afford such other and further relief as may be just and proper.

### Count II – Consumer Fraud (Violation of Statute)
### (Brought Solely by Ms. Ball)

93.     Ms. Ball incorporates and realleges each and every foregoing paragraph of this Complaint as though fully set forth herein.

94.     All or nearly all games operated by the Defendant, and participated in by Ms. Ball within the State of Nevada, were "played with cards… for money," rendering them "games" and



"gambling games" within the definitional ambit of Section 463.0152 of the Nevada Revised Statutes.

95.     All games operated by the Defendant, and participated in by Ms. Ball within the State of Nevada, were played "through the use of communications technology that allows a person, utilizing money, … electronic transfers of money… or any other instrumentality, to transmit to a computer information to assist in the placing of a bet or wager and corresponding information related to the display of the game, [or] game outcomes," and thus constituted "interactive gaming" within the definitional ambit of Section 463.016425 of the Nevada Revised Statutes.

96.     Section 463.160 of the Nevada Revised Statutes renders it "unlawful for any person… [t]o deal, operate, carry on, conduct, … or expose for play in the State of Nevada any gambling game… without having first procured… all federal, state, county and municipal gaming licenses or registrations."

97.     Section 463.750 of the Nevada Revised Statutes requires operators of interactive gaming be licensed and pay an investigation fee to acquire said license.

98.     The Defendant has exposed for play various gambling games, including 21 Blitz, within the State of Nevada, without having first procured all requisite gaming licenses.

99.     The Defendant has operated interactive gaming within the State of Nevada without a license and without paying an investigation fee to acquire a license.

100.    Ms. Ball has been damaged in the sum of $678,000.00, being the monies she lost to a cheater while playing the Defendant's illegal gambling games and the monies of hers the Defendant has wrongfully impounded pursuant to its operation of those illegal gambling games.



WHEREFORE, Ms. Ball respectfully prays this Honorable Court (i) enter judgment in her favor, and against the Defendant, in the sum of Six Hundred Seventy Eight Thousand Dollars and No Cents ($678,000.00) as and for actual damages, pursuant to the allowances of Section 41.600(3)(a) of the Nevada Revised Statutes; (ii) award Ms. Ball her reasonable attorneys' fees and costs in this case, and reduce the same to a judgment in her favor, and against the Defendant, pursuant to the allowances of Section 41.600(3)(c) of the Nevada Revised Statutes; and (iii) afford such other and further relief as may be just and proper.

### Count III – Fraud
### (Brought by Ms. Ball and Mr. Prignano)

101.    The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

102.    The Defendant's website has advertised, at all times relevant, "Skillz technology and teams ensure that each tournament provides the same circumstances to each player. Software and fraud prevention teams also monitor gameplay to prevent cheating and ensure competitions are fair."

103.    Additionally, on April 16, 2019, the Defendant wrote to Mr. Prignano, "If we find a confirmed cheater we will refund entry fees and reach out to let a player know."

104.    Commencing not later than August 2019, John Doe began cheating in games of 21 Blitz against the Plaintiffs herein.

105.    John Doe would cheat in such games by, *inter alia*, utilizing a function wherein he could pause the subject games with appreciable frequency so as to count cards.

106.    For the avoidance of doubt, John Doe was *not* merely mentally counting cards; by pausing the 21 Blitz app, he was able to keep detailed records of cards distributed and, inversely, cards remaining in each game's deck, and to then exploit such records to make optimal plays.

107.    The Defendant was aware of John Doe's cheating and even notified him of such, writing to John Doe, *inter alia*, "We are now informing you that some items in your account have been consistent with our internal risk patterns… Usually in this situation we permanently ban the user. Any winnings earned from violating our Terms of Service have been forfeited. Please consider this your only warning. I can reopen your main account, but you must write back explicitly agreeing to our Terms of Service…"

108.    The Plaintiffs are aware of the username of John Doe but elect to not include it herein in deference to his privacy; however, to the extent the same must be alleged to comply with the pleading rigors of this Honorable Court, the Plaintiffs are prepared to specifically allege such information.

109.    The Defendant failed to refund Ms. Ball and Mr. Prignano monies lost to John Doe in cheated matches.

110.    The Defendant's representations concerning its policing of cheating, and its refund of cheated monies, were thusly false at all times relevant.

111.    The Defendant knew these representations to be false at all times relevant as evidenced by its failure to stop John Doe from cheating and its failure to refund Ms. Ball and Mr. Prignano the monies lost to John Doe in cheated matches.

112.    The Defendant made its representations concerning its policing of cheating, and its refund of cheated monies, in connection with its promotion of its apps and in connection with dealings with players; these representations were thus expressly calculated to induce the reliance

of players into continuing to wager monies on the Defendant's apps under this false guise of security and indemnification.

113.    Ms. Ball and Mr. Prignano both were familiar with these policies of the Defendant and these communications of the Defendant; they would not have continued to wager monies on 21 Blitz and other apps of the Defendant but for the false guise of security and indemnification offered by these express representations.

114.    Ms. Ball has been damaged by the Defendant's fraud in a sum equal to the approximately $650,000.00 she lost in cheated matches.

115.    Mr. Prignano has been damaged by the Defendant's fraud in a sum equal to the approximately $1,300,000.00 he lost in cheated matches to not just John Doe but, too, John Doe #2 and John Doe #3.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of Ms. Ball, and against the Defendant, in the sum of Six Hundred Fifty Thousand Dollars and No Cents ($650,000.00) as and for actual damages; (ii) enter judgment in favor of Ms. Ball, and against the Defendant, in the sum of One Million Five Hundred Thousand Dollars and No Cents ($1,500,000.00) as and for punitive damages; (iii)  enter judgment in favor of Mr. Prignano, and against the Defendant, in the sum of One Million Three Thousand Dollars and No Cents ($1,300,000.00) as and for actual damages; (iv) enter judgment in favor of Mr. Prignano, and against the Defendant, in the sum of Two Million Five Hundred Thousand Dollars and No Cents ($2,500,000.00) as and for punitive damages; and (v) afford such other and further relief as may be just and proper.

## Count IV – Negligent Misrepresentation
### (Brought by Ms. Ball and Mr. Prignano)

116.    The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

117.    The Defendant falsely represented that monies lost in cheated matches would be refunded to consumers of 21 Blitz and its other apps.

118.    The Defendant also falsely represented that it was policing its platform for cheating behavior.

119.    The Defendant made these representations in the course of its business by, *inter alia*, e-mailing them to consumers of its apps.

120.    The Defendant made these representations with the intent they be relied upon by consumers of its apps like 21 Blitz.

121.    Ms. Ball and Mr. Prignano did justifiably rely on these representations in wagering hundreds of thousands of dollars on the Defendant's 21 Blitz app.

122.    Ms. Ball and Mr. Prignano have been damaged by their reliance on these representations, with such damages being equal to the monies they lost to John Doe in cheated matches together with monies Mr. Prignano lost to John Doe #2 and John Doe #3 in cheated matches.

123.    The Defendant did not exercise reasonable care in making these representations as it was evidently unwilling to honor the promise inherent in these representations.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of Ms. Ball, and against the Defendant, in the sum of Six Hundred Fifty Thousand Dollars and No Cents ($650,000.00) as and for actual damages; (ii) enter judgment in favor of Mr.

Prignano, and against the Defendant, in the sum of One Million Three Hundred Thousand Dollars and No Cents ($1,300,000.00) as and for actual damages; and (iii) afford such other and further relief as may be just and proper.

**Count V – Negligence Per Se**
**(Brought by Ms. Ball)**

124.     The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

125.     Section 463.160 of the Nevada Revised Statutes renders it "unlawful for any person… [t]o deal, operate, carry on, conduct, … or expose for play in the State of Nevada any gambling game… without having first procured… all federal, state, county and municipal gaming licenses or registrations."

126.     This statute is intended to protect patrons from the risks associated with unregulated gaming including, *inter alia*, the risk of cheating and the risk of gaming operators wrongfully impounding player monies.

127.     As a consumer within the State of Nevada, Ms. Ball falls within this protected class of individuals.

128.     The Defendant breached this statute by exposing for play a gambling game without procuring appropriate licensure.

129.     The Defendant's breach has caused Ms. Ball to suffer damages in the form of cheating losses and impounded monies.

130.     Ms. Ball has been damaged in a sum equal to the approximately $28,000.00 she had wrongfully impounded and the $650,000.00 she lost to John Doe.



COMPLAINT AND DEMAND FOR TRIAL BY JURY - 21

WHEREFORE, Ms. Ball respectfully prays this Honorable Court (i) enter judgment in favor of Ms. Ball, and against the Defendant, in the sum of Six Hundred Seventy Eight Thousand Dollars and No Cents ($678,000.00) as and for actual damages and (ii) afford such other and further relief as may be just and proper.

### Count VI – Negligence Per Se
### (Brought by Mr. Prignano)

131.    The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

132.    Section 47.01 of the Texas Penal Code defines "bet" as "an agreement to win or lose something of value solely or partially by chance."

133.    21 Blitz has an element of chance inasmuch as players cannot predict what cards will come next in a deck and are thus made to guess at the optimal configuration of columns.

134.    Section 47.03 of the Texas Penal Code renders it an offense to "for gain, become[] a custodian of anything of value bet or offered to be bet."

135.    Section 47.05 of the Texas Penal Code renders it an offense to "knowingly provide[] … equipment for the transmission" of bets.

136.    The Defendant held player monies – including those of Mr. Prignano – as custodian, for purposes of facilitating bets made with those same monies on, *inter alia*, the 21 Blitz app.

137.    The Defendant furnished the 21 Blitz app to Mr. Prignano, when Mr. Prignano was located within the State of Texas, by making it available for download and play in that state.



138.     This statutory scheme is intended to protect patrons from the risks associated with gaming including, *inter alia*, the risk of cheating and the risk of gaming operators wrongfully impounding player monies.

139.     As a consumer within the State of Texas, Mr. Prignano falls within this protected class of individuals.

140.     The Defendant breached this statutory scheme by acting as custodian of monies to be wagered on the 21 Blitz app.

141.     The Defendant breached this statutory scheme by knowingly providing the 21 Blitz app to Mr. Prignano.

142.     The Defendant's breaches have caused Ms. Prignano to suffer damages in the form of cheating losses and impounded monies.

143.     Mr. Prignano has been damaged in a sum equal to the approximately $286,000.00 he had wrongfully impounded and the $1,300,000.00 he lost in matches played against John Doe, John Doe #2 and John Doe #3.

WHEREFORE, Mr. Prignano respectfully prays this Honorable Court (i) enter judgment in favor of Mr. Prignano, and against the Defendant, in the sum of One Million Five Hundred Eighty Six Thousand Dollars and No Cents ($1,586,000.00) as and for actual damages and (ii) afford such other and further relief as may be just and proper.

**Count VII – Negligent Misrepresentation**
**(Brought by Mr. Prignano)**

144.     The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.



145.    The Defendant represented that if Mr. Prignano accrued enough rewards points –
in the form of putative "tickets" – he would be able to redeem the same for a new Porsche Boxster.

146.    The Defendant knew this representation was false as it was not actually prepared
to give a new Porsche Boxster to anyone – whether it be Mr. Prignano or any other user of the
Defendant's apps.

147.    The Defendant made this representation with the intent of inducing people to earn
rewards points by wagering monies on games.

148.    Mr. Prignano justifiably relied on this representation in electing to play the
Defendant's games so as to earn a Porsche Boxster.

149.    Mr. Prignano has been damaged by not receiving the Porsche Boxster to which he
is entitled.

WHEREFORE, Mr. Prignano respectfully prays this Honorable Court (i) enter judgment
in favor of Mr. Prignano, and against the Defendant, in a sum equal to the manufacturer's
suggested retail price of a new Porsche Boxster, as and for actual damages and (ii) afford such
other and further relief as may be just and proper.

**Count VIII – Unjust Enrichment**
**(Brought by Ms. Ball and Mr. Prignano)**

150.    The Plaintiffs incorporate and reallege each and every foregoing paragraph of this
Complaint as though fully set forth herein.

151.    The Defendant has frozen Ms. Ball's account balance of approximately
$28,000.00.

152.    The Defendant has frozen Mr. Prignano's account balance of approximately
$286,000.00.



153.     Each of these account balances is formed solely by monies belonging to Ms. Ball and Mr. Prignano respectively; all funds contained therein were either deposited by the Plaintiffs or deposited by other persons and won by the Plaintiffs.

154.     These monies have never been paid over to the Defendant for non-custodial purposes or won by the Defendant, and thus constitute a benefit conferred on the Defendant by Ms. Ball and Mr. Prignano, respectively.

155.     The Defendant is aware of this benefit and has nonetheless insisted on taking these monies as its own.

156.     It is inherently inequitable for the Defendant to impound player monies and claim such as its own; even if the Defendant were a lawful gaming establishment, it would not be permitted to do so under governing law.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of Ms. Ball, and against the Defendant, in the sum of Twenty Eight Thousand Dollars and No Cents ($28,000.00) as and for actual damages; (ii) enter judgment in favor of Mr. Prignano, and against the Defendant, in the sum of Two Hundred Eight Six Thousand Dollars and No Cents ($286,000.00); and (iii) afford such other and further relief as may be just and proper.

**Count IX – Declaratory Judgment**
**(Brought by Ms. Ball and Mr. Prignano)**

157.     The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

158.     The Defendant maintains its operations are lawful in nature, featuring a "Why its legal?" section on its website that boasts, *inter alia*, "Skillz cash tournaments are not gambling because all of our competitions are based on ability, rather than luck or chance. True to its name,



Skillz hosts games where players' skill determines the winner of each tournament. Skillz does not profit on the outcome of a tournament, and has no vested interest in who wins or loses."

159.    The Defendant's apps further boast, *inter alia*, "**What makes Skillz legal?** All games with cash-enabled competitions have undergone patented tests to ensure they are as fair and skill-based as possible."

160.    The Defendant's app further boasts, *inter alia*, "**What is the difference between skill-based gaming and gambling?** Players' abilities determine the outcome of a skill-based competition. Gambling involves significant elements of chance and increased performance is often uncorrelated with additional play."

161.    Ms. Ball and Mr. Prignano maintain the Defendant is not lawfully operating by reason of, *inter alia*, its failure to obtain a gaming license in the State of Nevada despite exposing gambling games for play in the State of Nevada, and its operation of games partially informed by chance in the State of Texas.

162.    There is an actual, justiciable controversy between the parties as to this issue, as the legality, *vel non*, of the Defendant's operations will inform the extent of relief available to the Plaintiffs herein.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) pursuant to Section 2201 of Title 28 of the United States Code and Federal Rule of Civil Procedure 57 (a) declare the Defendant's operation of the 21 Blitz app, within the State of Nevada, to be in contravention of Section 463.160 of the Nevada Revised Statutes; (b) declare the Defendant's operation of the 21 Blitz app, within the State of Texas, to be in contravention of Sections 47.03 and 47.05 of the Texas Penal Code; (c) declare the Defendant's operation of the 21 Blitz app, within the United States, to be in contravention of Section 5363 of Title 31 of the United States



Code; (d) declare the Defendant's operation of the 21 Blitz app, within the United States, to be in contravention of Section 1955 of Title 18 of the United States Code; and (ii) afford such other and further relief as may be just and proper.

## Jury Demand

Pursuant to, and in accordance with, the allowances of Federal Rule of Civil Procedure 38, Ms. Ball and Mr. Prignano pray a trial by jury on all matters so triable.

Respectfully submitted,

<u>/s/ Maurice B. VerStandig</u>
Maurice B. VerStandig, Esq.
Bar No. 15346
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Telephone: 301-444-4600
Facsimile: 301-576-6885
Electronic Mail: mac@mbvesq.com
*Counsel for the Plaintiffs*

