Maurice VerStandig, Esq.
Nevada Bar No.: 15346
THE VERSTANDIG LAW FIRM, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Telephone: (301)444-4600
Facsimile: (301)444-4600
Email:  mac@mbvesq.com
*Counsel for Ms. Ball, Mr. Prignano and Jane Roe*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ALYSSA BALL, | * |
| | * |
| JOHN PRIGNANO, | * |
| | * |
| and | * |
| | *   Case No. 2:20-cv-888 -JAD-BNW |
| JANE ROE, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| SKILLZ INC., | * |
| | * |
| Defendant. | * |

## **FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY**

Come now Alyssa Ball ("Ms. Ball"), John Prignano ("Mr. Prignano") and Jane Roe (Ms. Ball, Mr. Prignano, and Jane Roe being collectively known as the "Plaintiffs" and each sometimes being known as a "Plaintiff"), by and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), and as and for their first amended complaint (the "Complaint") against Skillz Inc. ("Skillz" or the "Defendant") state as follows:



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 1

### Introduction

1.       This case concerns the Defendant's operation of an illegal gambling racket within the United States and, more particularly, within the States of Nevada, Texas and Colorado; and the Defendant's failure to implement appropriate security measures in its operation of its illicit games.

2.       The Defendant's illegal conduct, coupled with its predatory advertising scheme depicting its services as risk free opportunities for individuals to supplement their income with additional monies, led Plaintiff Jane Roe to engage in high stakes gambling activity without realizing or understanding the same to be gambling activity, wagering – and losing – tens of thousands of dollars, going deeply into personal debt, becoming emotionally distraught, fighting off suicidal inclinations, and ultimately entering a support group for problem gamblers once she came to realize the Defendant's product to be in the nature of a gambling product.

3.       The Defendant's illegal conduct also caused Plaintiffs Ball and Prignano to lose over a million dollars to an individual the Defendant knew to be cheating in such games.

4.       When Ms. Ball had the temerity to inquire about being refunded monies lost to a known cheater in the Defendant's games, a bizarre set of events unfolded whereby the Defendant blocked Ms. Ball's access to the Defendant's games, and Ms. Ball contacted the Defendant's chief executive officer.

5.       When contacted by Ms. Ball, the Defendant's chief executive officer – a 36-year-old man – learned Ms. Ball to be 19-years-old, promptly inquired "Do you like older guys?" and endeavored to arrange a rendezvous with her in Las Vegas, Nevada.

6.       Thereafter, the Defendant impounded approximately $28,000.00 of monies belonging to Ms. Ball, indicated it would not refund her the approximately $650,000.00 in monies

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 2

she lost to an individual the Defendant knew to be cheating, and created a pretextual and counterfactual narrative to justify expelling Ms. Ball from participation in its illegal games.

7.    At the same time, the Defendant, apparently either unwilling or unable to produce a Porsche Boxster Mr. Prignano had won on its platform,  impounded approximately $286,000.00 of monies belonging to Mr. Prignano, indicated it would not refund him the approximately $950,000.00 in monies he lost in games against an individual the Defendant knew to be cheating, and created a similar pretextual and counterfactual narrative to justify expelling Mr. Prignano from participation in its illegal games.

8.    This suit is brought so Jane Doe may recover the monies she was duped into losing to a well-disguised illegal gambling operation, so Ms. Ball and Mr. Prignano may recover the monies the Defendant allowed to be swindled by a cheater, so Ms. Ball and Mr. Prignano may recover other monies lost to other cheaters the Defendant failed to timely detect despite its promises to do so, so Ms. Ball and Mr. Prignano may recover the monies of theirs being wrongfully held by the Defendant, so injunctive relief may be entered to stop the Defendant from retraumatizing Jane Roe – and its other victims – through triggering and deceptive advertisements, and so an appropriate declaratory judgment may be entered to prevent the Defendant – an unlicensed operator of illegal gambling activities – from causing further harm to the American citizenry.

**Parties**

9.    Ms. Ball is a natural person who is a citizen of the State of Nevada by virtue of her ongoing residency therein.

10.    Mr. Prignano is a natural person who is a citizen of the State of Texas by virtue of his ongoing residency therein.

11.     Jane Roe is a natural person who is a citizen of the State of Colorado by virtue of her ongoing residency therein. The true identity of Jane Roe is being withheld pending adjudication of her motion for leave to proceed under a fictitious name, being filed concurrently herewith. Jane Roe seeks to use a pseudonym in these proceedings as her claims – unlike those of Ms. Ball and Mr. Prignano – concern her formation of an addiction to gambling, the impact of that addiction on her mental health (including her developing suicidal inclinations), and the destructive impact of that addiction on her personal life as well as the lives of those around her. Jane Roe is a public servant in the healthcare sector, employed by a governmental body, who worries revelation of her identity in this prism may also lead to complications in her professional endeavors. The true identity of Jane Roe is being shared, of even date herewith, with the Defendant, through its counsel, and with this Honorable Court through the sealed filing of a supplemental certificate of interested parties.

12.     The Defendant is a Delaware corporation with its principle place of business being in the State of California.

### Jurisdiction & Venue

13.     This Honorable Court enjoys jurisdiction over the matter *sub judice* pursuant to the allowances of Section 1332 of Title 28 of the United States Code, as this is a dispute between citizens of different states in which the matter in controversy exceeds $75,000.00.

14.     Venue is properly laid in the Honorable Court pursuant to Section 1391(b) of Title 28 of the United States Code because a substantial part of the events giving rise to the claims stated herein occurred through Ms. Ball's play of the Defendant's games in Clark County, Nevada.



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 4

**General Allegations: 21 Blitz**

15.     The Defendant operates various app-based online games in which individuals wager money against one another to partake in contests, with each contest typically having a duration of three minutes or less.

16.     The Defendant aggregates the wagers of the two competing parties and deducts from the sum a portion – typically equal to Sixteen and Two Thirds Percent (16.67%) – as an operation fee or, in colloquial parlance, a "rake."

17.     One of the Defendant's most popular games is 21 Blitz, which is available for download from the "App Store" maintained by Apple Inc. and made available on the operating system of all, or nearly all, smartphones manufactured by Apple Inc., including the popular iPhone series of smartphones.

18.     In a game of 21 Blitz, a full deck of cards is exposed one card at a time, in a putatively random order, with the user then being tasked with placing each card, upon it becoming exposed, in one of four columns.

19.     The objective of 21 Blitz is to arrange the cards so that those in each column add up to 21, being a riff on the classic casino game of blackjack; once the cards in a given column add up to 21, the column is "cleared" and becomes available for the placement of new cards.

20.     If a player in 21 Blitz places cards in a column such that their cumulative value exceeds 21, the game declares the player has "busted" (utilizing the classic blackjack verbiage) and the subject column clears; if a player busts three times before clearing the entire deck, the game ends; otherwise, the game ends when all 52 cards have been distributed.

21.     21 Blitz also offers two alternative methods of clearing a column.

22.     The first alternative method is whereby a column clears if a player amasses five cards in that column without exceeding the sum of 21 (being a riff on the "6-card Charlie" rule of certain games of blackjack, especially those of an older vintage).

23.     The second alternative method is whereby the placement of the jack of spades or the jack of clubs (literally, the two "black jacks") will automatically clear a column without regard to the sum of cards contained therein.

24.     A player's score in 21 Blitz is computed based on (i) the number of cards the player was able to clear; (ii) the number of stacks the player was able to clear; (iii) the amount of time under three (3) minutes the player took the complete the game; and (iv) some combination of other factors the Defendant does not disclose including, upon information and belief, at least one factor unknown to the Defendant itself on account of the Defendant's utilization of software developed by a third party.

25.     Whichever of the two (2) players in a given contest of 21 Blitz has a higher score is awarded the monies wagered by both players, less the Defendant's rake.

26.     The order in which the cards are dealt in a game of 21 Blitz is putatively random, meaning there are various permutations and combinations of cards that will force a player to "bust" several times in a row; if, by way of anecdote only, of the first twelve (12) cards distributed in a given game, eight (8) are face cards or tens, and the remaining four do not include any aces, the player will likely be compelled to bust three columns in rapid duration and end the game with a rather low score.

27.     Other games operated by the Defendant include "13 Card Tournament," an almost-precise aping of the form of "Chinese Poker" exposed for play in various Nevada casinos; "Solitaire Cube," a game in which two people play solitaire and are scored based on the number


VerStandig
LAW FIRM

of cards they are able to move, the amount of time they expend, and the number of turns of the deck they utilize; and "Texas Solitaire," a game in which cards are "dealt" in pairs of two and a traditional Texas hold 'em board is unveiled with the deal of each duo of cards, as players are encouraged to arrange the dealt cards to make the best possible series of video poker hands.

### General Allegations: Cheating Policy

28.     The Defendant's website has advertised, at all times relevant, "Skillz technology and teams ensure that each tournament provides the same circumstances to each player. Software and fraud prevention teams also monitor gameplay to prevent cheating and ensure competitions are fair."

29.     The Defendant has also long promised players that if cheating is detected in a match, the victimized player will receive a full refund of her or his entry fee for the subject match.

30.     Despite this assurance, the Defendant has, from time to time, detected cheating in connection with its various games.

31.     It has been the pattern and practice of the Defendant, upon discovering cheating, to notify impacted players who lost contests to an individual engaged in such cheating, and to refund such victims the monies they lost in those given contests.

32.     When this would occur, impacted victims would sometimes receive an e-mail, from the Defendant, typically reading, *inter alia*, "In our continuing effort to keep the system safe, we identified a user or users that you were matched against that violated our Terms of Service. As a result, we have made the following changes on your account. We have credited," with a dollar figure then being inserted, followed by the word "Cash."



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 7

33.    By way of anecdote only, on April 16, 2019, the Defendant wrote to Mr. Prignano, *inter alia*, "If we find a confirmed cheater we will refund entry fees and reach out to let a player know."

34.    Members of the Skillz gaming community, including Ms. Ball and Mr. Prignano, came to rely on Skillz to both operate a platform devoid of cheating but, too, to follow through with this course of conduct when cheating is detected.

35.    Had Ms. Ball and Mr. Prignano not been confident any losses to individuals who cheated would, in turn, be refunded, they would not have continued playing the Defendant's games.

**General Allegations: Ms. Ball's Play of the Defendant's Games**

36.    Commencing in or about August 2019, Ms. Ball began playing various of the Defendant's games, with the majority of her time and effort being devoted to 21 Blitz.

37.    Ms. Ball initially lost approximately $50,000 playing the Defendant's games, but was able to form effective strategies in so doing, ultimately becoming a generally profitable player.

38.    Ms. Ball would wager, on average, hundreds of dollars on each game of the Defendant's in which she partook, with each game typically having a duration of between one (1) and two (2) minutes.

39.    In light of Ms. Ball's election to play the Defendant's games at high stakes, there was a relatively small pool of players against whom she would regularly play, with one such individual being herein designated as "John Doe."

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 8



40.     After John Doe participated in several matches against Ms. Ball, the Defendant discovered John Doe to be cheating in such matches, through his manipulation of the Defendant's 21 Blitz app.

41.     The Defendant then sent an e-mail to Joe Doe indicating, *inter alia*: "We are now informing you that some items in your account have been consistent with our internal risk patterns… Usually in this situation we permanently ban the user. Any winnings earned from violating our Terms of Service have been forfeited. Please consider this your only warning. I can reopen your main account, but you must write back explicitly agreeing to our Terms of Service…"

42.     The Defendant thus deviated from its usual course of conduct and, in lieu of banning John Doe from participating in its games, permitted John Doe to continue playing in such games.

43.     In various matches against John Doe, both before and after the Defendant sent John Doe the foregoing e-mail, Ms. Ball lost to John Doe the approximate sum of $650,000.

**General Allegations: Ms. Ball's Complaint, Suspension and Expulsion**

44.     When Ms. Ball learned of John Doe's cheating, she inquired of the Defendant when she would be receiving a refund of monies lost to John Doe in cheated matches.

45.     The Defendant demurred to Ms. Ball's request, indicating it would not be refunding her, despite its pattern and practice of having done so with smaller sums of money in the past.

46.     The Defendant then suspended Ms. Ball's account for the pretextual purpose of obtaining verification of Ms. Ball's identity and the veracity of her play.



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 9

47.     When Ms. Ball promptly sent the Defendant verification of her identity and the veracity of her play – and went so far as to offer to travel to San Francisco to present proof of the same in person – the Defendant kept her account suspended without explanation.

48.     At this juncture, Ms. Ball located Andrew Paradise ("Mr. Paradise"), the founder and chief executive officer of Skillz, through Instagram, a social media platform.

49.     Mr. Paradise, whose Instagram account has restricted access, accepted Ms. Ball's request for access and sent her a message reading "Have we met somewhere? I feel like I'd remember as you're too beautiful to be forgettable. Haha and if we haven't met, we should, I'm in Vegas all the time."

50.     Ms. Ball then introduced herself as a consumer of Skillz' games.

51.     Mr. Paradise then indicated he "just got out of a long term relationship" before inquiring of Ms. Ball her age.

52.     Ms. Ball truthfully indicated that she is 19-years-old, to which Mr. Paradise responded "I'm 37," followed by his insertion of an emoji modeled after one of the three wise monkeys whose eyes are concealed.

53.     Mr. Paradise then immediately inquired, "do you like older guys?," before adding, "…would love to meet you in Vegas maybe later in February[.] But have to crash for now – we're doing a ribbon cutting ceremony with Steve [Y]oung, Jerry [R]ice and the mayor of Miami tomorrow…"

54.     Some dialogue ensued, with Ms. Ball sharing her frustration having her account suspended without explanation and asking if Mr. Paradise would call her to discuss; Mr. Paradise, in turn, proposed the two speak via a video chatting platform, only to ultimately call off the conversation, writing, "Ah my team doesn't want me to do this so we shall have to postpone.

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 10

They're concerned that you are part of a ring of known cheating/fraud people involver a user named prignum."

55.     Shortly thereafter, Ms. Ball's account with the Defendant was permanently terminated, the approximately $28,000 balance of that account was impounded by the Defendant, and she was notified the Defendant would neither tender to her that account balance nor the monies she lost to an individual the Defendant itself identified as a known cheater.

56.     Ms. Ball has never cheated another user in a Skillz game, is not part of a "fraud ring," and believes these assertions to be a pretextual and demonstrably counterfactual campaign of the Defendant to (i) avoid paying her the approximately $650,000 out of which she was cheated by John Doe; and (ii) minimize the fallout of its chief executive officer having intimated a desire to have a rendezvous, in Las Vegas, with a 19-year-old consumer of the Defendant.

### General Allegations: Mr. Prignano's Play of the Defendant's Games

57.     Commencing in or about December 2018, Mr. Prignano began playing the Defendant's games, also dedicating the majority of his efforts to 21 Blitz.

58.     Mr. Prignano is an elite eSports gamer, and welcomed the opportunity to wager sums of money on his play against other individuals on a putatively honest and fair gaming platform.

59.     Mr. Prignano registered for the Defendant's apps under the username "prignum" (being the individual referenced in Mr. Paradise's discussion with Ms. Ball *supra*).

60.     Mr. Prignano initially lost approximately $5,000.00 to $7,000.00 playing the Defendant's games before gaining a mastery of 21 Blitz, and then proceeded to earn significant monies through his play of over 70,000 games of 21 Blitz, with most such games being played for several hundred dollars apiece.

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 11

**General Allegations: Mr. Prignano's Attempted Redemption of Rewards Points**

61.     In playing the Defendant's games, Mr. Prignano – like Ms. Ball and all other players – would accrue nominal rewards points based on the stakes and frequency with which he played; Mr. Prignano paid careful attention to these points and the prizes for which they could be supposedly redeemed.

62.     In or about May 2019, Mr. Prignano noticed he was accruing rewards points rapidly, based on his frequent play and the high stakes nature of his play; this led Mr. Prignano to consider what prizes he may aspire to redeem if his play continued, and he commenced to endeavor to earn a new Porsche Boxster.

63.     By August 2019, Mr. Prignano had accrued enough rewards points to redeem the new Porsche Boxster.

64.     When Mr. Prignano endeavored to redeem the car, the Defendant immediately commenced erecting obstacles, demanding he earn additional rewards points to redeem the car, informing him it was actually to be a used car, demanding verification of his play, and otherwise stalling.

65.     Meanwhile, the Defendant – seemingly caught off-guard someone actually could earn enough points to garner a Porsche Boxster – commenced taking steps to make it more difficult for others to do so, raising the membership point threshold for redemption by approximately 66% without notifying its user base of this change in terms and, in essence, moving the proverbial goal line in so doing.

66.     After more than five months, the Defendant still had not delivered to Mr. Prignano a Porsche Boxster – whether new, used, or otherwise.



67.     At this point, the Defendant undertook a strategic effort to avoid its obligation to Mr. Prignano with regard to the Porsche Boxster and, too, to seize his then-current account balance, which was a staggering $286,000.00 or so.

68.     In so doing, the Defendant lodged similar – and equally counterfactual – allegations against Mr. Prignano that it had against Ms. Ball, albeit with some added claims of a uniformly untrue (and, in one case, conceptually impossible) nature.

**General Allegations: Mr. Prignano Cheated by Same Individual as Ms. Ball**

69.     With Mr. Prignano and Ms. Ball both being amongst the relatively small pool of "high rollers" on the Defendant's 21 Blitz app, Mr. Prignano also played numerous matches against John Doe in which Mr. Prignano was cheated.

70.     Mr. Prignano lost approximately $950,000.00 in entry fees in matches he played against John Doe.

71.     This followed Mr. Prignano losing approximately $100,000.00 to another individual understood to be cheating ("John Doe #2") slightly before the at-issue matches with John Doe.

72.     On multiple occasions, Mr. Prignano informed the Defendant he suspected John Doe to be cheating.

73.     Despite this information, the Defendant continued to boast of the integrity of its platform and continued to pair Mr. Prignano in matches against John Doe.

74.     Mr. Prignano later learned yet another individual ("John Doe #3") was cheating on the platform, taking from Mr. Prignano approximately $250,000.00.

75.     Mr. Prignano naively assumed the first instance of the Defendant failing to make him whole for losses to John Doe #2 was an administrative oversight; he now understands the

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 13



Defendant was simply unwilling to honor its guarantee to players when any appreciable sum of money was implicated.

76.    Mr. Prignano now further understands the Defendant was not merely ignoring his concerns; the Defendant was, in fact, confronting John Doe about cheating on the platform but nonetheless permitting John Doe to continue playing against Mr. Prignano and Ms. Ball.

### Notification of Intent to Amend

77.    Mr. Prignano was present in the State of Texas for the majority of the games of 21 Blitz in which he partook.

78.    Mr. Prignano intends to seek recourse under the Deceptive Trade Practices-Consumer Protection Act set forth in Section 17.41, *et seq.* of the Texas Business and Commerce Code.

79.    Section 17.505 of the Texas Business and Commerce Code requires a defendant be afforded notice at least 60 days before such a suit is brought.

80.    Mr. Prignano will be furnishing the Defendant with the requisite statutory notice and is hopeful there will be no need to bring suit under this consumer statute as the Defendant will see fit to remedying the issues outlined by Mr. Prignano.

81.    However, should such a remedy not be entertained by the Defendant, Mr. Prignano intends to amend this Complaint at such a time as the 60 day notice period has elapsed, and herein makes note of his intent to do so solely to avoid any suggestion such amendment will somehow cause prejudice to the Defendant.

82.    Ms. Ball, having been present in Nevada for the majority of the 21 Blitz games she played, seeks recourse *infra* under Nevada's consumer protection laws, which have no such notice requirement, though she did make demand on the Defendant prior to bringing this suit.

83.     Jane Roe, having been present in Colorado for the majority of the 21 Blitz games she played, seeks recourse *infra* under Colorado's consumer protection laws, which have no such notice requirement.

### General Allegations: Spoliation

84.     Ms. Ball made demand on the Defendant on May 7, 2020.

85.     As part of Ms. Ball's demand to the Defendant, she notified the Defendant of its obligation to not destroy evidence pertinent to her allegations including, *inter alia*, "all written communications with Ms. Ball…"

86.     Notwithstanding Ms. Ball's notice to the Defendant of its need to abstain from destroying evidence, shortly after the Defendant received Ms. Ball's demand such a destruction occurred.

87.     Specifically, on or about May 14, 2020, Mr. Paradise deleted the whole of his Instagram conversation with Ms. Ball, in which he had inquired of her interest in "older men" and endeavored to arrange a thinly-veiled sexual rendezvous with her in Las Vegas.

88.     It is not presently known what other records the Defendant and its agents have destroyed, but there is appreciable concern they have used the time afforded by Ms. Ball's settlement demand not to entertain a resolution of this case but, rather, to destroy the evidence tending to incriminate their actions herein and, as noted *infra*, their actions in contravention of federal and state criminal law.

### General Allegations: The Defendant's Deceptive Advertising

89.     The Defendant runs various internet and app-based video advertisements for its products, with many such advertisements being on platforms catering to a targeted audience of frugal individuals.

90.     Specifically, the Defendant has run advertisements on, *inter alia*, The Penny Hoarder, a website featuring content aiding individuals in saving money and maximizing economic efficiencies.

91.     Jane Roe first encountered the Defendant through its advertisements on The Penny Hoarder, with such advertisements promoting the Defendant's products as an opportunity to make additional income through the use of smart phone apps.

92.     One such advertisement promoted Skillz as a vehicle housewives could use to pay for the carpeting of their home, through minimal efforts in their spare time.

93.     While Jane Roe does not have copies of the video advertisements she saw (as consumers generally do not make video copies of the advertisements they consume), the Defendant has continued this pattern and practice, with its current advertising including spots that promote montages of joyous people (inferentially being persons who use its apps), and colorful text advertising "That's an extra $60 a month," followed by the words "Not too shabby."

94.     One of the Defendant's advertisements, using the same structural scheme, shows a woman playing on her smartphone in bed, with textual overlaps reading, *inter alia*, "Now say you make $10 a day," followed by "That's… wait for it… $300 extra a month," as the images cut away to another woman using her smartphone in what appears to be her home.

95.     The same ad includes overlaid text promotion, "Now that's time well spent," as well as "And that extra money?" followed by "We're sure that will be well spent, too," before imploring the viewer to download one of the Defendant's apps.

96.     Nowhere do these advertisements note the possibility – much less probability – of consumers losing money while using the Defendant's apps.



97.     These advertisements do not contain any of the "Problem Gaming" warnings that are common in the regulated gaming industry.

98.     These advertisements, instead, are designed to lure to the Defendant's products a demographic unsavvy to the risks of gambling, and the advertisements take appreciable care to neither suggest or imply the Defendant's apps are anything other than an opportunity to make modest additional income through interactive efforts.

### General Allegations: Jane Roe's Playing of the 21 Blitz

99.     Prior to the events at issue herein, Jane Roe had never gambled in a casino save for her infrequent wager of $20 on a roulette wheel when going to a casino to see a show, had never partaken in gambling activity above such nominal sums, and had no experience risking appreciable money in gambling games.

100.     Jane Roe is a government employee in the healthcare field, with a modest blue-collar background, who has taken diligent steps to preserve her income in a conservative fashion.

101.     During a time of emotional grief, following the death of her father, Jane Roe, as a consumer of The Penny Hoarder, saw the Defendant's advertisements and was induced to download 21 Blitz.

102.     Jane Roe did not understand 21 Blitz is a gambling app; as it was not marketed or advertised as being in the nature of a gambling platform, and it bore none of the traditional markings of a virtual casino, she genuinely believed it was an opportunity to make additional monies through her exertion of efforts.

103.     Over the course of approximately seven months, Jane Roe uploaded – and lost – more than $60,000 on 21 Blitz.

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 17

104.    Every time Jane Roe lost money, she assumed she just needed to try harder and would be able to make it back.

105.    This led Jane Roe to upload more and more money, taking on debt so as to have monies to upload to the 21 Blitz app for her to play with.

106.    Jane Roe even borrowed money from her mother and stepfather, blue collar senior citizens in Vermont, so she would have the ability to make back what she had lost and gain the profit she believed she was able to achieve based on the Defendant's advertising.

107.    As Jane Roe's losses piled up, she became more and more panicked and despondent in nature.

108.    The rapid decline of Jane Roe's mental health climaxed toward the end of 2019, when she lost $13,000 she had borrowed and became suicidal in nature.

109.    Specifically, Jane Roe saw no means of making back the money she had lost, was experiencing self-perceived embarrassment and humiliation from having been duped into a gambling addiction, and began to vividly contemplate self-harm as a means of escaping these issues, going so far as to make a rather specific plan.

110.    Jane Roe saw her personality change as she became addicted to the Defendant's product, ceased being a boisterously outgoing person, and became a withdrawn individual.

111.    Jane Roe shared her suicidal inclinations with the Defendant via e-mail, at which point in time the Defendant refunded to Jane Roe her final $13,000 deposit and blocked Jane Roe's account, indicating it would not refund the other monies she had lost.

112.    Jane Roe has since come to understand she is a compulsive gambler who at first did not realize she was engaged in gambling activity and who then could not fight off urges given the ease-of-access that comes from having the ability to gamble on one's omnipresent



smartphone; she has sought help from Gamblers Anonymous and continues to seek other forms of help as she combats her addiction and the harm it has done to her.

113.    Jane Roe has worked with mental health professionals to address this situation, and continues to take medication and seek treatment as appropriate.

114.    Jane Roe remains heavily in debt, has not repaid her mother and stepfather, and goes about her life just trying to earn an income sufficient to eventual pay back those from whom she borrowed.

115.    Jane Roe, however, as an ongoing consumer of frugality publications, is still bombarded with the Defendant's advertisements from time to time, and is emotionally triggered every time she sees such an ad, with it making her relive this gut-wrenching ordeal.

116.    Jane Roe learned of this lawsuit through the press, after it was initially filed on behalf of Ms. Ball and Mr. Prignano; she is added as a plaintiff herein because this amended pleading is the first opportunity she has had to join this litigation upon becoming aware of its pendency and contacting undersigned counsel.

### General Allegations: Terms of Service

117.    When a consumer opens an account with the Defendant, the consumer is required to enter her or his date of birth on an app screen.

118.    Under the place for the consumer to enter her or his date of birth is a large button with the word "NEXT" imprinted upon it, which the consumer is to click to proceed with the registration process.

119.    Beneath the button, in markedly smaller print, are the words "By tapping 'Next', I agree to the Terms of Service and the Privacy Policy."

120.    These words do *not* appear on the button; they are beneath it.



121.    Thusly, if a consumer reads a screen from top to bottom, and enters her or his date of birth and then clicks the button immediately below, the consumer will never see these words.

122.    At no point in the registration process is a consumer actually shown the Defendant's putative terms of service (the "Terms of Service") unless the consumer is able to spot this fine print and elects to click on it in lieu of the "NEXT" button.

123.    The "NEXT" button inherently implies to consumers that is the item they are to click, not the fine print buried beneath that button.

124.    At no point in the registration process is a consumer asked to check a box indicating she or he has read the Terms of Service or any of the provisions thereof.

125.    The Terms of Service purport to govern the conditions upon which one engages in the unlawful gambling furnished on Skillz' various apps.

126.    A consumer receives no benefit or thing of value, other than the ability to participate in illegal gambling activities, on account of the Terms of Service.

**General Allegations: Criminality**

127.    As noted *infra*, the actions of the Defendant herein violate both federal and state gaming laws.

128.    At no time during their play of games on the Defendant's platform were Ms. Ball, Mr. Prignano and/or Jane Roe aware of the criminal nature of the games they were playing.

129.    Rather, inasmuch as the games were offered via Apple Inc.'s widely-policed App Store, and monetary transactions occurred through reputable third-party vendors such as PayPal, Ms. Ball, Mr. Prignano and Jane Doe suffered the delusion of believing they were engaged in lawful gaming activity.



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 20

130.    Not until after Ms. Ball and Mr. Prignano were expelled from the Defendant's platform did they learn of the illegal nature of the Defendant's business.

131.    Not until learning of this lawsuit did Jane Doe learn of the illegal nature of the Defendant's business.

### Count I – Consumer Fraud (False Representation)
### (Brought Solely by Ms. Ball)

132.    Ms. Ball incorporates and realleges each and every foregoing paragraph of this Complaint as though fully set forth herein.

133.    The Defendant's website has advertised, at all times relevant, "Skillz technology and teams ensure that each tournament provides the same circumstances to each player. Software and fraud prevention teams also monitor gameplay to prevent cheating and ensure competitions are fair."

134.    The Defendant knew, for a period of at least three months, John Doe was cheating in contests hosted by the Defendant, yet continued to make the foregoing statement on its website, in contravention of Section 598.0915(15) of the Nevada Revised Statutes.

135.    Ms. Ball has been damaged in the sum of $650,000.00, being the monies she lost to John Doe whose cheating was not prevented by the Defendant despite its fraudulent representation to the contrary.

WHEREFORE, Ms. Ball respectfully prays this Honorable Court (i) enter judgment in her favor, and against the Defendant, in the sum of Six Hundred Fifty Thousand Dollars and No Cents ($650,000.00) as and for actual damages, pursuant to the allowances of Section 41.600(3)(a) of the Nevada Revised Statutes; (ii) award Ms. Ball her reasonable attorneys' fees and costs in this case, and reduce the same to a judgment in her favor, and against the Defendant, pursuant to the

allowances of Section 41.600(3)(c) of the Nevada Revised Statutes; and (iii) afford such other and further relief as may be just and proper.

**Count II – Consumer Fraud (Violation of Statute)**
**(Brought Solely by Ms. Ball)**

136.   Ms. Ball incorporates and realleges each and every foregoing paragraph of this Complaint as though fully set forth herein.

137.   All or nearly all games operated by the Defendant, and participated in by Ms. Ball within the State of Nevada, were "played with cards… for money," rendering them "games" and "gambling games" within the definitional ambit of Section 463.0152 of the Nevada Revised Statutes.

138.   All games operated by the Defendant, and participated in by Ms. Ball within the State of Nevada, were played "through the use of communications technology that allows a person, utilizing money, … electronic transfers of money… or any other instrumentality, to transmit to a computer information to assist in the placing of a bet or wager and corresponding information related to the display of the game, [or] game outcomes," and thus constituted "interactive gaming" within the definitional ambit of Section 463.016425 of the Nevada Revised Statutes.

139.   Section 463.160 of the Nevada Revised Statutes renders it "unlawful for any person… [t]o deal, operate, carry on, conduct, … or expose for play in the State of Nevada any gambling game… without having first procured… all federal, state, county and municipal gaming licenses or registrations."

140.   Section 463.750 of the Nevada Revised Statutes requires operators of interactive gaming be licensed and pay an investigation fee to acquire said license.

141.    The Defendant has exposed for play various gambling games, including 21 Blitz, within the State of Nevada, without having first procured all requisite gaming licenses.

142.    The Defendant has operated interactive gaming within the State of Nevada without a license and without paying an investigation fee to acquire a license.

143.    Ms. Ball has been damaged in the sum of $678,000.00, being the monies she lost to a cheater while playing the Defendant's illegal gambling games and the monies of hers the Defendant has wrongfully impounded pursuant to its operation of those illegal gambling games.

WHEREFORE, Ms. Ball respectfully prays this Honorable Court (i) enter judgment in her favor, and against the Defendant, in the sum of Six Hundred Seventy Eight Thousand Dollars and No Cents ($678,000.00) as and for actual damages, pursuant to the allowances of Section 41.600(3)(a) of the Nevada Revised Statutes; (ii) award Ms. Ball her reasonable attorneys' fees and costs in this case, and reduce the same to a judgment in her favor, and against the Defendant, pursuant to the allowances of Section 41.600(3)(c) of the Nevada Revised Statutes; and (iii) afford such other and further relief as may be just and proper.

### Count III – Fraud
### (Brought by Ms. Ball and Mr. Prignano)

144.    The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

145.    The Defendant's website has advertised, at all times relevant, "Skillz technology and teams ensure that each tournament provides the same circumstances to each player. Software and fraud prevention teams also monitor gameplay to prevent cheating and ensure competitions are fair."



146.    Additionally, on April 16, 2019, the Defendant wrote to Mr. Prignano, "If we find a confirmed cheater we will refund entry fees and reach out to let a player know."

147.    Commencing not later than August 2019, John Doe began cheating in games of 21 Blitz against the Plaintiffs herein.

148.    John Doe would cheat in such games by, *inter alia*, utilizing a function wherein he could pause the subject games with appreciable frequency so as to count cards.

149.    For the avoidance of doubt, John Doe was *not* merely mentally counting cards; by pausing the 21 Blitz app, he was able to keep detailed records of cards distributed and, inversely, cards remaining in each game's deck, and to then exploit such records to make optimal plays.

150.    The Defendant was aware of John Doe's cheating and even notified him of such, writing to John Doe, *inter alia*, "We are now informing you that some items in your account have been consistent with our internal risk patterns… Usually in this situation we permanently ban the user. Any winnings earned from violating our Terms of Service have been forfeited. Please consider this your only warning. I can reopen your main account, but you must write back explicitly agreeing to our Terms of Service…"

151.    The Plaintiffs are aware of the username of John Doe but elect to not include it herein in deference to his privacy; however, to the extent the same must be alleged to comply with the pleading rigors of this Honorable Court, the Plaintiffs are prepared to specifically allege such information.

152.    The Defendant failed to refund Ms. Ball and Mr. Prignano monies lost to John Doe in cheated matches.

153.    The Defendant's representations concerning its policing of cheating, and its refund of cheated monies, were thusly false at all times relevant.

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 24



154.    The Defendant knew these representations to be false at all times relevant as evidenced by its failure to stop John Doe from cheating and its failure to refund Ms. Ball and Mr. Prignano the monies lost to John Doe in cheated matches.

155.    The Defendant made its representations concerning its policing of cheating, and its refund of cheated monies, in connection with its promotion of its apps and in connection with dealings with players; these representations were thus expressly calculated to induce the reliance of players into continuing to wager monies on the Defendant's apps under this false guise of security and indemnification.

156.    Ms. Ball and Mr. Prignano both were familiar with these policies of the Defendant and these communications of the Defendant; they would not have continued to wager monies on 21 Blitz and other apps of the Defendant but for the false guise of security and indemnification offered by these express representations.

157.    Ms. Ball has been damaged by the Defendant's fraud in a sum equal to the approximately $650,000.00 she lost in cheated matches.

158.    Mr. Prignano has been damaged by the Defendant's fraud in a sum equal to the approximately $1,300,000.00 he lost in cheated matches to not just John Doe but, too, John Doe #2 and John Doe #3.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of Ms. Ball, and against the Defendant, in the sum of Six Hundred Fifty Thousand Dollars and No Cents ($650,000.00) as and for actual damages; (ii) enter judgment in favor of Ms. Ball, and against the Defendant, in the sum of One Million Five Hundred Thousand Dollars and No Cents ($1,500,000.00) as and for punitive damages; (iii)  enter judgment in favor of Mr. Prignano, and against the Defendant, in the sum of One Million Three Thousand Dollars and No Cents



($1,300,000.00) as and for actual damages; (iv) enter judgment in favor of Mr. Prignano, and against the Defendant, in the sum of Two Million Five Hundred Thousand Dollars and No Cents ($2,500,000.00) as and for punitive damages; and (v) afford such other and further relief as may be just and proper.

**Count IV – Negligent Misrepresentation**
**(Brought by Ms. Ball and Mr. Prignano)**

159.    The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

160.    The Defendant falsely represented that monies lost in cheated matches would be refunded to consumers of 21 Blitz and its other apps.

161.    The Defendant also falsely represented that it was policing its platform for cheating behavior.

162.    The Defendant made these representations in the course of its business by, *inter alia*, e-mailing them to consumers of its apps.

163.    The Defendant made these representations with the intent they be relied upon by consumers of its apps like 21 Blitz.

164.    Ms. Ball and Mr. Prignano did justifiably rely on these representations in wagering hundreds of thousands of dollars on the Defendant's 21 Blitz app.

165.    Ms. Ball and Mr. Prignano have been damaged by their reliance on these representations, with such damages being equal to the monies they lost to John Doe in cheated matches together with monies Mr. Prignano lost to John Doe #2 and John Doe #3 in cheated matches.



166.     The Defendant did not exercise reasonable care in making these representations as it was evidently unwilling to honor the promise inherent in these representations.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of Ms. Ball, and against the Defendant, in the sum of Six Hundred Fifty Thousand Dollars and No Cents ($650,000.00) as and for actual damages; (ii) enter judgment in favor of Mr. Prignano, and against the Defendant, in the sum of One Million Three Hundred Thousand Dollars and No Cents ($1,300,000.00) as and for actual damages; and (iii) afford such other and further relief as may be just and proper.

**Count V – Negligent Misrepresentation**
**(Brought by Mr. Prignano)**

167.     The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

168.     The Defendant represented that if Mr. Prignano accrued enough rewards points – in the form of putative "tickets" – he would be able to redeem the same for a new Porsche Boxster.

169.     The Defendant knew this representation was false as it was not actually prepared to give a new Porsche Boxster to anyone – whether it be Mr. Prignano or any other user of the Defendant's apps.

170.     The Defendant made this representation with the intent of inducing people to earn rewards points by wagering monies on games.

171.     Mr. Prignano justifiably relied on this representation in electing to play the Defendant's games so as to earn a Porsche Boxster.

172.     Mr. Prignano has been damaged by not receiving the Porsche Boxster to which he is entitled.



WHEREFORE, Mr. Prignano respectfully prays this Honorable Court (i) enter judgment in favor of Mr. Prignano, and against the Defendant, in a sum equal to the manufacturer's suggested retail price of a new Porsche Boxster, as and for actual damages and (ii) afford such other and further relief as may be just and proper.

**Count VI – Unjust Enrichment**
**(Brought by Ms. Ball and Mr. Prignano)**

173.     The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

174.     The Defendant has frozen Ms. Ball's account balance of approximately $28,000.00.

175.     The Defendant has frozen Mr. Prignano's account balance of approximately $286,000.00.

176.     Each of these account balances is formed solely by monies belonging to Ms. Ball and Mr. Prignano respectively; all funds contained therein were either deposited by the Plaintiffs or deposited by other persons and won by the Plaintiffs.

177.     These monies have never been paid over to the Defendant for non-custodial purposes or won by the Defendant, and thus constitute a benefit conferred on the Defendant by Ms. Ball and Mr. Prignano, respectively.

178.     The Defendant is aware of this benefit and has nonetheless insisted on taking these monies as its own.

179.     It is inherently inequitable for the Defendant to impound player monies and claim such as its own; even if the Defendant were a lawful gaming establishment, it would not be permitted to do so under governing law.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of Ms. Ball, and against the Defendant, in the sum of Twenty Eight Thousand Dollars and No Cents ($28,000.00) as and for actual damages; (ii) enter judgment in favor of Mr. Prignano, and against the Defendant, in the sum of Two Hundred Eight Six Thousand Dollars and No Cents ($286,000.00); and (iii) afford such other and further relief as may be just and proper.

### Count VII – Violation of the Colorado Consumer Protection Act
### (Brought by Jane Roe)

180.     The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

181.     Section 6-1-105(1)(u) of the Colorado Revised Statutes provides, *inter alia*, that a person "engages in a deceptive trade practice" when the person, "Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."

182.     The Defendant, in its advertisements consumed by Jane Roe on The Penny Hoarder and elsewhere, did not disclose that Skillz is a gambling platform.

183.     The Defendant, in its advertisements consumed by Jane Roe on The Penny Hoarder and elsewhere, did not disclose that the majority of Skillz users lose money on the platform because of the rake structure.

184.     An individual not savvy in the gaming world, and not knowing Skillz is a gambling platform, would not understand how the rake structure leads a majority of Skillz consumers to lose money.



185.    An individual not savvy in the gaming world, and not familiar with gambling in general, would not immediately recognize Skillz to be a gambling platform.

186.    The Defendant withheld this material information as part of its advertising campaign as its target audience – including Jane Roe – would be less likely to participate in the Defendant's games if made aware of the likelihood of losing money.

187.    To the contrary, the Defendant advertised its platform as an opportunity for consumers to make small amounts of money each day, with those small sums adding up to more appreciable sums over time that can be used for such purposes as carpeting one's home.

188.    Jane Roe has been directly damaged by this deceptive trade practice, as it has led her to lose approximately $60,000.00 on the Defendant's platform.

189.    Jane Roe has been further damaged by this deceptive trade practice in the form of mental anguish she has suffered attendant to becoming a problem gambler, the incursion of debt to family members, perceived social embarrassment, and the fighting off of suicidal inclinations.

WHEREFORE, Jane Roe respectfully pray this Honorable Court (i) enter judgment in her favor, and against the Defendant, in the sum of One Hundred Eighty Thousand Dollars and No Cents ($180,000.00) as and for actual damages, together with prejudgment interest at the legal rate of eight percent (8%) per annum, pursuant to the allowances of Section 6-1-113(2)(a)(III) of the Colorado Revised Statutes; (ii) award Jane Roe her reasonable and necessary attorneys' fees incurred in connection with this action, and reduce the same to judgment in her favor, and against the Defendant, pursuant to the allowances of Section 601-113(2)(b) of the Colorado Revised Statutes; and (iii) afford such other and further relief as may be just and proper.

## Count VIII – Violation of the Colorado Consumer Protection Act
### (Brought by Jane Roe)

190.    The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

191.    Section 6-1-105(1)(z) of the Colorado Revised Statutes provides, *inter alia*, that a person "engages in a deceptive trade practice" when the person, "Refuses or fails to obtain all governmental licenses or permits required to perform the services or to sell the goods, food, services, or property as agreed to or contracted for with a consumer."

192.    The Defendant's operation of the 21 Blitz app constitutes "professional gambling" within the definitional ambit of Section 18-10-102 of the Colorado Revised Statutes and is thusly prohibited absent the Defendant obtaining licensure under the Colorado Limited Gaming Act as found at Section 44-30-101, *et seq.* of the Colorado Revised Statutes.

193.    If the Defendant were licensed under the Colorado Limited Gaming Act, the Defendant would be compelled to indicate to consumers its status as a purveyor of gambling and, further, to make information available on problem gaming and gambling addictions.

194.    Jane Roe has been directly damaged by this deceptive trade practice, as it has led her to lose approximately $60,000.00 on the Defendant's platform.

195.    Jane Roe has been further damaged by this deceptive trade practice in the form of mental anguish she has suffered attendant to becoming a problem gambler, the incursion of debt to family members, perceived social embarrassment, and the fighting off of suicidal inclinations.

WHEREFORE, Jane Roe respectfully pray this Honorable Court (i) enter judgment in her favor, and against the Defendant, in the sum of One Hundred Eighty Thousand Dollars and No Cents ($180,000.00) as and for actual damages, together with prejudgment interest at the legal

rate of eight percent (8%) per annum, pursuant to the allowances of Section 6-1-113(2)(a)(III) of the Colorado Revised Statutes; (ii) award Jane Roe her reasonable and necessary attorneys' fees incurred in connection with this action, and reduce the same to judgment in her favor, and against the Defendant, pursuant to the allowances of Section 601-113(2)(b) of the Colorado Revised Statutes; and (iii) afford such other and further relief as may be just and proper.

**Count IX – Violation of the Colorado Consumer Protection Act
(Brought by Jane Roe)**

196.    The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

197.    Section 6-1-105(1)(kkk) of the Colorado Revised Statutes provides, *inter alia*, that a person "engages in a deceptive trade practice" when the person, "Either knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice."

198.    The Defendant's advertising a gambling platform without disclosing (i) it is a gambling platform; (ii) the probability of consumers losing money thereupon; and (iii) that help is available for problem gamblers, constitutes an unconscionable act and practice.

199.    Jane Roe has been directly damaged by this deceptive trade practice, as it has led her to lose approximately $60,000.00 on the Defendant's platform.

200.    Jane Roe has been further damaged by this deceptive trade practice in the form of mental anguish she has suffered attendant to becoming a problem gambler, the incursion of debt to family members, perceived social embarrassment, and the fighting off of suicidal inclinations.



201.    Jane Roe continues to be damaged by this deceptive trade practice every time she sees an advertisement of the Defendant's, and will continue to suffer such damages unless and until the Defendant is enjoined from running such advertisements.

WHEREFORE, Jane Roe respectfully pray this Honorable Court (i) enter judgment in her favor, and against the Defendant, in the sum of One Hundred Eighty Thousand Dollars and No Cents ($180,000.00) as and for actual damages, together with prejudgment interest at the legal rate of eight percent (8%) per annum, pursuant to the allowances of Section 6-1-113(2)(a)(III) of the Colorado Revised Statutes; (ii) award Jane Roe her reasonable and necessary attorneys' fees incurred in connection with this action, and reduce the same to judgment in her favor, and against the Defendant, pursuant to the allowances of Section 601-113(2)(b) of the Colorado Revised Statutes; (iii) preliminarily and permanently enjoin the Defendant from running advertisements that do not disclose consumers are likely to lose money on its platform and that it operated a gambling platform; and (iv) afford such other and further relief as may be just and proper.

### Count X – Declaratory Judgment as to Terms of Service
### (Brought by Ms. Ball, Mr. Prignano and Jane Roe)

202.    The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

203.    The Defendant's Terms of Service violate public policy as they putatively serve to govern the conditions of illegal gambling transactions.

204.    Specifically, the Defendant's operations violate (i) Section 18-10-103 of the Colorado Revised Statutes; (ii) Sections 47.03 and 47.05 of the Texas Penal Code; (iii) Section 463.160 of the Nevada Revised Statutes; (iv) Section 5363 of Title 31 of the United States Code; and (v) Section 1955 of Title 18 of the United States Code.

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 33



205.    The Defendant maintains its Terms of Service are valid and binding.

206.    The Plaintiffs maintain the Defendant's Terms of Service are *void ab initio* as being in the nature of an illegal contract existing against public policy.

207.    The Defendant's Terms of Service contain an arbitration clause.

208.    The Plaintiffs maintain the arbitration clause is invalid because (i) the Terms of Service are *void ab initio*; (ii) the doctrine of severability does not apply to a contract that is *void ab initio*; (iii) the doctrine of severability is inapplicable in any event because the whole purpose of the Terms of Service is to facilitate the operation of an unlawful online casino; (iv) there has been no meeting of minds since the Terms of Service were not presented to the Plaintiffs prior to their play of 21 Blitz; (v) there has been no affirmative act of acceptance since consumers are never asked to affirmatively check, click, or otherwise interact with any box or button acknowledging acquiescence to the Terms of Service; and (vi) there is no valid consideration for consumers' putative agreement to the Terms of Service since participation in an illegal online casino cannot constitute legally valid consideration.

209.    The Plaintiffs are aware Mr. Prignano may have indicated his acquiescence to the Terms of Service, via e-mail, long after he commenced playing on the site; such does not impact the applicability of the Terms of Service to Ms. Ball or Jane Roe, and such does not change the applicability of the Terms of Service to Mr. Prignano for reasons related to illegality and contemporaneous consent.

210.    There is an actual, justiciable controversy between the parties as to this issue, as the validity, *vel non*, of the Defendant's Terms of Service will inform the venue in which this suit is adjudicated.



WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) pursuant to Section 2201 of Title 28 of the United States Code and Federal Rule of Civil Procedure 57 (a) declare the Defendant's Terms of Service to be invalid, and (b) declare the Plaintiffs to not be bound by the Defendant's Terms of Service; and (ii) afford such other and further relief as may be just and proper.

### Count XI – Declaratory Judgment as to Legality
### (Brought by Ms. Ball, Mr. Prignano and Jane Roe)

211.    The Plaintiffs incorporate and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

212.    The Defendant maintains its operations are lawful in nature, featuring a "Why its legal?" section on its website that boasts, *inter alia*, "Skillz cash tournaments are not gambling because all of our competitions are based on ability, rather than luck or chance. True to its name, Skillz hosts games where players' skill determines the winner of each tournament. Skillz does not profit on the outcome of a tournament, and has no vested interest in who wins or loses."

213.    The Defendant's apps further boast, *inter alia*, "**What makes Skillz legal?** All games with cash-enabled competitions have undergone patented tests to ensure they are as fair and skill-based as possible."

214.    The Defendant's app further boasts, *inter alia*, "**What is the difference between skill-based gaming and gambling?** Players' abilities determine the outcome of a skill-based competition. Gambling involves significant elements of chance and increased performance is often uncorrelated with additional play."

215.    Ms. Ball, Mr. Prignano and Jane Roe maintain the Defendant is not lawfully operating by reason of, *inter alia*, its failure to obtain a gaming license in the State of Nevada



despite exposing gambling games for play in the State of Nevada, and its operation of games partially informed by chance in the State of Texas and the State of Colorado.

216.    There is an actual, justiciable controversy between the parties as to this issue, as the legality, *vel non*, of the Defendant's operations will inform the extent of relief available to the Plaintiffs herein.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) pursuant to Section 2201 of Title 28 of the United States Code and Federal Rule of Civil Procedure 57 (a) declare the Defendant's operation of the 21 Blitz app, within the State of Nevada, to be in contravention of Section 463.160 of the Nevada Revised Statutes; (b) declare the Defendant's operation of the 21 Blitz app, within the State of Texas, to be in contravention of Sections 47.03 and 47.05 of the Texas Penal Code; (c) declare the Defendant's operation of the 21 Blitz app, within the State of Colorado, to be in contravention of Section 18-10-103 of the Colorado Revised Statutes; (d) declare the Defendant's operation of the 21 Blitz app, within the United States, to be in contravention of Section 5363 of Title 31 of the United States Code; (e) declare the Defendant's operation of the 21 Blitz app, within the United States, to be in contravention of Section 1955 of Title 18 of the United States Code; and (ii) afford such other and further relief as may be just and proper.

### Jury Demand

Pursuant to, and in accordance with, the allowances of Federal Rule of Civil Procedure 38, Ms. Ball, Mr. Prignano and Jane Roe pray a trial by jury on all matters so triable.

### [SIGNATURE ON FOLLOWING PAGE]

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 36



Respectfully submitted,

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. 15346
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Telephone: 301-444-4600
Facsimile: 301-444-4600
Electronic Mail: mac@mbvesq.com
*Counsel for the Plaintiffs*

## **CERTIFICATE OF SERVICE**

I certify that on this 20th day of July, 2020, I have caused a true and accurate copy of the foregoing to be served on the following person via this Honorable Court's CM/ECF system:

E. Leif Reid, Esq.
Lewis Roca Rothgerber Christie LLP
One East Liberty Street, Suite 300
Reno, Nevada 89501-2128
lreid@lrrc.com
*Counsel for the Defendant*

/s/ Maurice B. VerStandig
Maurice B. VerStandig



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 37