1

Maurice VerStandig, Esq.
Nevada Bar No.: 15346

2

THE VERSTANDIG LAW FIRM, LLC

3

1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012

4

Telephone: (301)444-4600
Facsimile: (301)444-4600

5

Email:  mac@mbvesq.com

6

*Counsel for Ms. Ball, Mr.
Prignano and Jane Roe*

7

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

8

9

ALYSSA BALL,                          *
                                      *
10

JOHN PRIGNANO,                        *
                                      *
11

         and                          *
                                      *
12

JANE ROE,                             *     Case No. 2:20-cv-888 -JAD-BNW
                                      *
13

         Plaintiffs,                  *
                                      *
14

         v.                           *
                                      *
15

SKILLZ INC.,                          *
                                      *
16

         Defendant.                   *
17

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

18

19

20

21

22

23

24

25

26



MOTION FOR PRELIMINARY INJUNCTION - i

## <u>TABLE OF CONTENTS</u>

I.      Introduction .................................................................................................................. 1

II.     Background Facts ........................................................................................................ 2

III.    Standard: Preliminary Injunction ............................................................................ 11

IV.     Argument: A Preliminary Injunction Should be Granted ........................................ 11

        a.   Jane Roe is Likely to Succeed on the Merits ............................................... 11

        b.   The Defendant's Advertisements Cause Jane Roe Irreparable Harm ....................... 14

        c.   The Balance of Hardships Tips in Favor of Jane Roe ................................... 15

        d.   Public Policy Strongly Favors Discontinuing the Defendant's Advertising ............. 17

V.      Conclusion ................................................................................................................ 19



## **TABLE OF AUTHORITIES**

**Cases**

*Amoco Production Co. v. Gambell*, 480 U.S. 531 (1987) ............................................................ 11

*Behymer-Smith ex rel. Behymer v. Coral Acad. of Sci.*, 427 F. Supp. 2d 969 (D. Nev. 2006).... 11

*Capitol Records v. Zahn*, 2007 WL 542816 (M.D. Tenn. 2007) ................................................ 16

*City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087 (S.D. Cal. 2012) ............................................ 15

*Dellums v. Smith*, 577 F.Supp. 1456 (N.D. Cal. 1984) .............................................................. 16

*Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184 (N.D. Cal. 2016) .................................... 16

*Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003) ...................... 11

*Earth Island Inst. v. United States Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006) ...................... 11

*Envtl. Prot. Info. Ctr. v. Carlson*, ___ F.3d ___ (9th Cir. 2020) .............................................. 18

*Harris v. Bd. of Supervisors*, 366 F.3d 754 (9th Cir. 2004) ..................................................... 14

*Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072 (N.D. Cal. 2016) ....................................... 16

*In re Focus Media Inc.*, 387 F.3d 1077 (9th Cir. 2004) ...................................................... 12, 14

*Livewirecyber, Inc. v. Lee*, 2017 WL 5640525 (C.D. Cal. 2017) ........................................ 16, 17

*M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012) ........................................................................ 14

*Miller v. Carlson*, 768 F. Supp. 1341 (N.D. Cal. 1991) ........................................................... 16

*Munaf v. Geren*, 553 U.S. 674 (2008) ...................................................................................... 11

*Reflex Media, Inc. v. Endeavor Standard SDN.*, 2019 WL 6792792 (C.D. Cal. 2019) .............. 16

*Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) .................................... 12

*Triad Sys. Corp. v. Southeaster Exp. Co.*, 64 F.3d 1330 (9th Cir. 1995) ................................. 16

*Weinberger v. Romero–Barcelo*, 456 U.S. 305 (1982) ............................................................. 11



*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...................................................... 11, 14

**Statutes**

Colorado Revised Statutes § 6-1-105 ............................................................. 12, 13, 16

Colorado Revised Statutes § 6-1-113 ...................................................................... 12

**Rules**

Federal Rule of Civil Procedure 65 ............................................................... 19

**Regulations**

Nevada Gaming Regulation § 5A.155 ............................................................ 18

Nevada Gaming Regulation § 5.011 ............................................................. 18



Comes now Jane Roe ("Jane Roe" or the "Plaintiff"),[1] by and through undersigned counsel, and moves this Honorable Court to preliminarily enjoin Skillz Inc. ("Skillz" or the "Defendant") from advertising within the State of Colorado, and in support thereof states as follows:

## I.        Introduction

The Defendant operates a collection of illegal gambling smartphone apps that contravene both the criminal and consumer protection laws of myriad states, including Colorado. In support of these apps, the Defendant advertises heavily on other apps and websites, often targeting a female demographic. Jane Roe, not realizing the Defendant was operating a *de facto* online casino, was duped by these advertisements, began patronizing the Defendant's apps, lost her life's savings, went into credit card debt, convinced her mother and stepfather to lend her money received by mortgaging their home, and lost these borrowed funds as well. Jane Roe became despondent and depressed, commenced seeking treatment for her gambling addiction, and is now trying to rebuild her life. Jane Roe, however, continues to be ambushed by the Defendant's advertisements.

The Defendant's promotional efforts serve to retrigger Jane Roe every time they are viewed; as discussed *infra*, these advertisements paint idyllic pictures of women using the Defendants' apps to make extra money, and altogether fail to so much as reference – much less disclose – that these are gambling apps. The advertisements are egregiously violative of Colorado's consumer protection laws, and, aside from continuing to threaten the citizenry of

---

[1] Jane Roe has filed a motion to proceed under a fictitious name in this litigation (DE #10), which is presently under advisement. Jane Roe's real name is indicated on a certificate of interested parties filed under seal (DE #12) and has been shared with all parties herein through their respective counsel.

VerStandig
LAW FIRM

Colorado at large, are serving to actively hamper Jane Roe's efforts at emotionally recovering from the appreciable harms done to her by the Defendant.

Accordingly, and as discussed in greater detail *infra*, it is appropriate to enjoin the Defendant from continuing to run advertisements in the State of Colorado. While this may seem a drastic remedy, the facts *sub judice* reveal the Defendant is advertising in an objectively unlawful manner and is promoting its products in such a fashion as to wildly deviate from the norms for marketing even lawful gambling activities.

## II.   Background Facts

This case concerns the Defendant's operation of various smartphone apps on which consumers may wager money against one another. *See* First Amended Complaint (the "Complaint," as found at DE #11), *passim*. One of the Defendant's hallmark games is 21 Blitz, a smartphone app that very closely resembles the game of blackjack. *See* Declaration of Jane Roe ("Jane Roe Dec."), attached hereto as Exhibit A ("Ex. A"), at ¶¶ 2-3.[2]

In a game of 21 Blitz, a full deck of cards is exposed one card at a time, in a putatively random order, with the user then being tasked with placing each card, upon it becoming exposed, in one of four columns. *See* Jane Roe Dec., Ex. A., at ¶ 4. The objective of 21 Blitz is to arrange the cards so that those in each column add up to 21, being a riff on the classic casino game of blackjack; once the cards in a given column add up to 21, the column is "cleared" and becomes available for the placement of new cards. *Id.* at ¶ 5.

If a player in 21 Blitz places cards in a column such that their cumulative value exceeds 21, the game declares the player has "busted" (utilizing the classic blackjack verbiage) and the

---

[2] Jane Roe's name has been redacted on the declaration to protect her identity. *See, supra,* n. 1.

subject column clears; if a player busts three times before clearing the entire deck, the game ends; otherwise, the game ends when all 52 cards have been distributed. *Id.* at ¶ 6. 21 Blitz also offers two alternative methods of clearing a column. *Id.* at ¶ 7. The first alternative method is whereby a column clears if a player amasses five cards in that column without exceeding the sum of 21 (being a riff on the "6-card Charlie" rule of certain games of blackjack, especially those of an older vintage); the second alternative method is whereby the placement of the jack of spades or the jack of clubs (literally, the two "black jacks") will automatically clear a column without regard to the sum of cards contained therein. *Id.* at ¶¶ 8-9.

A player's score in 21 Blitz is computed based on (i) the number of cards the player was able to clear; (ii) the number of stacks the player was able to clear; (iii) the amount of time under three (3) minutes the player took the complete the game; and (iv) some combination of other factors the Defendant does not disclose. *Id.* at ¶ 10.

Whichever of the two (2) players in a given contest of 21 Blitz has a higher score is awarded the monies wagered by both players, less the Defendant's rake. *Id.* at ¶ 11.

The Defendant's "rake" in games of 21 Blitz typically equals Sixteen and Two Thirds Percent (16.67%) of the monies wagered by both players. *Id.* at ¶ 12.

The Defendant runs various internet and app-based video advertisements for its products (including games aside from 21 Blitz that are also gambling games and that are also operated by the Defendant and promoted under its logo), with many such advertisements being on platforms catering to a targeted audience of frugal individuals. *Id.* at ¶ 13. Specifically, the Defendant has run advertisements on, *inter alia*, The Penny Hoarder, a website featuring content aiding individuals in saving money and maximizing economic efficiencies. *Id.* at ¶ 14.



Jane Roe first encountered the Defendant through its advertisements on The Penny Hoarder, with such advertisements promoting the Defendant's products as an opportunity to make additional income through the use of smart phone apps. *Id.* at ¶ 15. One such advertisement promoted Skillz as a vehicle housewives could use to pay for the carpeting of their home, through minimal efforts in their spare time. *Id.* at ¶ 16.

A social media advertisement of the Defendant features a woman discussing how she played the Defendant's games – and made money doing so – while in labor, delivering a child:







---

[3] These images are excerpted from a social media video. They do not capture every frame of the video or even the vast majority of the video; while they are excerpted to show some of the more alarming qualities of the Defendant's advertising, Jane Roe does not contend these screen shots to constitute the whole of a single advertisement. *See* Declaration of M. VerStandig, attached hereto as Exhibit B, at ¶ 5.



Myriad other advertisements feature women playing the Defendant's games in various settings, boasting of how women are able to make monies playing the Defendant's games and put those funds to good use:









1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26


























---

[4] These ads have been captured from various social media platforms and non-gambling iPhone apps. The images are screenshots from various advertisements, not a singular advertisement. The images do not portray the whole of any one advertisement but, rather, are selective portions of various video advertisements. *See* Declaration of M. VerStandig, attached hereto as Exhibit B, at ¶ 5.



Jane Roe had not previously ever engaged in any substantial gambling activity. *Id.* at ¶ 17. Not realizing the Defendant to be a gambling entity, she downloaded one of the Defendant's apps and began uploading money in hopes of making money, as advertised. *Id.* at ¶ 18.

Jane Roe proceeded to lose her life's savings and go into debt, trying to make money on the Defendant's apps. *Id.* at ¶ 19. She then borrowed money from her mother and stepfather to continue in her quest to make money on the Defendant's apps, becoming a compulsive gambler somewhere in the process of playing these games. *Id.* at ¶ 20. She ultimately lost approximately $60,000 on the Defendant's apps. *Id.* at ¶ 21.

Through the process of losing money and gambling compulsively, Jane Roe became depressed, dependent, and suicidal. *Id.* at ¶ 22.

Jane Roe sought help through Gamblers Anonymous and private therapy. *Id.* at ¶ 23. She is still receiving treatment for her depression and her addiction as of present. *Id.* at ¶ 24. She suffers ongoing perceived embarrassment from the ordeal she has suffered, and continues to confront complex emotional issues attendant to this experience. *Id.* at ¶ 25.

The Defendant's pervasive online and app-based advertisements are still seen by Jane Roe. *Id.* at ¶ 26. She encounters these advertisements on social media, on websites, and in apps. *Id.* at ¶ 27. Every time she sees one such advertisement, it serves to "retrigger" her to some degree; to whatever extent her mind may be free of the harms she has suffered – and continues to suffer – for some fleeting portion of time, encountering an advertisement of the Defendant's brings her mind back to what she has gone through and the harms that have been done to her life. *Id.* at ¶ 28.

### III.   Standard: Preliminary Injunction

As this Honorable Court has previously observed, a preliminary injunction may be granted in consideration of four disjunctive criteria:

> The Ninth Circuit recently reiterated the two sets of criteria for granting preliminary injunctive relief. Under the traditional criteria, a court may grant a preliminary injunction if the moving party shows "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to [the moving party] if preliminary relief is not granted, (3) a balance of hardships favoring the [moving party], and (4) advancement of the public interest (in certain cases)." Alternatively, a court may grant a preliminary injunction if the moving party "demonstrates either a combination of probable success on the merits and the possibility of irreparable harm or that serious questions are raised and the balance of hardships tips sharply in his favor."

*Behymer-Smith ex rel. Behymer v. Coral Acad. of Sci.*, 427 F. Supp. 2d 969, 972 (D. Nev. 2006) (quoting *Earth Island Inst. v. United States Forest Serv.*, 442 F.3d 1147, 1158-1159 (9th Cir. 2006) (quoting *Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1297 (9th Cir. 2003)). *See also*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.") (citing *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311-312 (1982)).

### IV.   Argument: A Preliminary Injunction Should be Granted

#### a.   Jane Roe is Likely to Succeed on the Merits

The laws of Colorado – where Jane Roe resides and where Jane Roe played the Defendant's games – plainly prohibit advertisements that fail to disclose material information about a product or service. The Defendant is advertising online casino games without so much



as mentioning (i) its platform involves gambling; (ii) consumers can lose money; and (iii) consumers are statistically likely to lose money. This is a black letter violation of Colorado law, and Jane Roe is thus likely to prevail on her claim for violation of the Colorado Consumer Protection Act (Count VII of the Complaint).[5]

Under governing law, in order to show a substantial likelihood of success on the merits, one must demonstrate only "a fair chance of success." *In re Focus Media Inc*., 387 F.3d 1077, 1086 (9th Cir. 2004) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)).

Under Colorado law, "A person engages in a deceptive trade practice" when "in the course of the person's business, vocation, or occupation, the person… Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction…" Colo. Rev. Stat. § 6-1-105(1)(u). The statutory scheme goes on to provide civil recourse to any person who "[i]s an actual or potential consumer of the defendant's goods, services, or property and is injured as a result of such deceptive trade practice…" Colo. Rev. Stat. § 6-1-113(1)(a).

Here, Jane Roe has clearly established that she was a consumer of the Defendant's goods and services – she gambled (and lost) tens of thousands of dollars on the Defendant's smartphone apps. And, similarly, she has clearly demonstrated injury both in the form of her

---

[5] Jane Roe has brought three claims for violation of the Colorado Consumer Protection Act, being Counts VII, VIII and IX of the Complaint. For purposes of this motion, she focusses solely on the claim stated in Count VII.



financial losses as well as the mental anguish – including that symptomatic of addiction – she has suffered as a result of using the Defendant's apps.

The lone remaining requirement, to establish a violation of the Colorado Consumer Protection Act and an entitlement to recourse thereunder, is demonstrating the Defendant "Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction…" Colo. Rev. Stat. § 6-1-105(1)(u).

The Defendant's advertisements do not disclose that consumers can (and, indeed, are likely to) lose money on the Defendant's apps. This is certainly "material information" and the withholding of this information can be reasonably understood as being calculated to induce consumers (like Jane Roe) to use the Defendant's products.

Indeed, by taking a "rake," the Defendant creates an ecosystem akin to a Las Vegas poker room, where money is removed from the consumer pool every time a game is played. This directly ensures the average consumer will lose money, as the total prize pool is less than that wagered by competing patrons. By way of anecdote only, in a two person match, with a sixteen and two thirds percent (16.67%) "rake," the average player will lose slightly over eight percent (8%) of her money. Extrapolated over hundreds – if not thousands – of matches, given the Defendant's heavy promotion of each match only lasting a few minutes, this adds up to a considerable sum whereby the average consumer will lose appreciable sums of money.

Yet the Defendant does not advertise that people may lose money – it only shows people winning money, promotes how that money can accumulate over time, and urges consumers that those profits can be put "to good use." To be sure, one viewing the Defendant's ads, without any contextual knowledge of the issues alleged in this lawsuit, would have absolutely no idea



someone could lose money on the Defendant's apps – the advertisements genuinely make it

appears as though the Defendant is paying people to play games just as myriad websites pay

individuals to take surveys or watch advertisements.

For these reasons, Jane Roe has more than "a fair chance of success" in her claim for

violation of the Colorado Consumer Protection Act, under the *In re Focus Media Inc.* standard.

She accordingly demonstrates a likelihood of success on the merits herein.

### b.  The Defendant's Advertisements Cause Jane Roe Irreparable Harm

The trauma Jane Roe has suffered at the hands of the Defendant can hardly be

understated – she has gone from living a typical middle class life in the scenic throes of

Colorado to attending therapy, being a member of Gamblers Anonymous, coping with crippling

debt, and dealing with the sheer perceived embarrassment of having borrowed money from

others to feed a gambling habit. This trauma is amplified – to a cringeworthy degree – every

time Jane Roe sees one of the Defendant's illegal advertisements, which she has been unable to

avoid. And she thus continues to suffer irreparable harm through the Defendant's running of

these ads.

As the United States Court of Appeals for the Ninth Circuit has observed, "A plaintiff

who seeks preliminary injunctive relief must show 'that irreparable injury is likely in the

absence of an injunction.' She need not further show that the action sought to be enjoined is the

exclusive cause of the injury." *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012) (quoting

*Winter*, 555 U.S. at 22; citing *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004)).

Here, Jane Roe is emotionally retriggered by the Defendant's advertisements. To

whatever extent she can find ways to escape the shadow the Defendant has cast over her life,

and turn her mind away from the appreciable harm she has suffered, those efforts are



undermined every time she sees an advertisement promoting one of the Defendant's products. That the advertisements almost uniformly portray other women gleefully making money on these products only compounds the emotional harm.

Worse, since the Defendant advertises in forums seemingly strategically targeted at people like Jane Roe – frugal middle-class women – it is nearly impossible for Jane Roe to avoid these advertisements. This is not a case where she can forbear from opening promotional mailings from a casino; this is a case where the Defendant's advertisements follow her on her smartphone and thus invade her life at the most random and unpredictable of times. By simply browsing the internet, Jane Roe risks being ambushed by the Defendant's illicit marketing.

Jane Roe is trying, with appreciable effort, to move on with her life. So long as the Defendant is advertising its products in a manner that bombards her, she is unable to do so as effectively as one might hope, and every time she sees one such advertisement, she suffers necessary emotional duress. She is thus irreparably harmed by these marketing campaigns, and will continue to be so harmed unless and until they are enjoined.

### c.  The Balance of Hardships Tips in Favor of Jane Roe

It is difficult to assess the balance of hardships in any quantifiable fashion, since Jane Roe's harms are emotional in nature and the Defendant's advertisements presumably lead to its pecuniary gain. However, inasmuch as the injunction sought herein would merely compel the Defendant to comply with governing law, it is suggested there is no colorable hardship it will suffer if enjoined.

Injunctive relief requiring a party to adhere to the law is, by definition, not a cognizable hardship upon that party. *See, e.g.*, *City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087, 1113 (S.D. Cal. 2012) ("The third factor, the balance of hardships, is also satisfied. There is no harm to



Shah since an injunction would merely require Shah to comply with the law.") (citing *Capitol Records v. Zahn*, 2007 WL 542816, at *4 (M.D. Tenn. 2007)); *Miller v. Carlson*, 768 F. Supp. 1341, 1343 (N.D. Cal. 1991) ("[I]irreparable injury" to a party being enjoined "is unlikely where the Court has merely ordered the defendants to comply with the law.") (citing *Dellums v. Smith*, 577 F.Supp. 1456, 1458 (N.D. Cal. 1984)); *Reflex Media, Inc. v. Endeavor Standard SDN. BHD.*, 2019 WL 6792792, at *4 (C.D. Cal. 2019) ("In considering the balance of hardships between the parties, Defendants would suffer no harm by being required to comply with existing law. Defendants are likely to argue that they may lose money from its audience by having to change its website, but such argument would be unavailing.") (citing *Triad Sys. Corp. v. Southeaster Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995)); *Livewirecyber, Inc. v. Lee*, 2017 WL 5640525, at *3 (C.D. Cal. 2017) ("The public interest is served, and the balance of hardships tips sharply in a plaintiff's favor when a defendant is required to do no more than comply with the law.") (citing *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077-1078 (N.D. Cal. 2016); *Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184, at *7 (N.D. Cal. 2016)).

As noted *supra*, the Defendant's advertisements constitute egregious violations of the Colorado Consumer Protection Act. Even putting aside the legality, *vel non*, of the Defendant's apps (which is not the subject of this motion, as Jane Roe no longer uses these apps), it is clear the Defendant is advertising a product without disclosing that consumers are likely to lose money by utilizing that product. This is a flagrant violation of Section 6-1-105(1)(u) of the Colorado Revised Statutes, and enjoining the Defendant from running such advertisements will only serve to bring the Defendant into compliance with this governing statutory scheme.

By contrast, the absence of an injunction will continue to make Jane Roe susceptible to appreciable emotional harms, will continue to hamper her efforts to rebuild her life from the



ruins created by the Defendant, and will continue to create an intrinsic fear every time she so much as uses her smartphone or browses the internet.

Moreover, the injunction sought herein will only apply to advertising in Colorado, specifically so as to minimize the impact on the Defendant. While it is argued in this case the Defendant is also actively violating the laws of the State of Nevada, the State of Texas, and, indeed, the United States of America, the injunction sought here is narrowly tailored to prevent ongoing harm to Jane Roe, a resident of Colorado who scarcely leaves the state. In an age of online advertising, it is easy for businesses to "geofence" their marketing campaigns; it should prove simple for the Defendant to cease advertising in Colorado without hampering the Defendant's promotional efforts in other states.

The balance of Jane Roe continuing to be harmed, with the Defendant merely having to comport with governing law in a single state, readily tips in favor of Jane Roe. The third criteria of preliminary injunctive relief is accordingly well satisfied herein.

### d.  Public Policy Strongly Favors Discontinuing the Defendant's Advertising

Inasmuch as Jane Roe's claim giving rise to this motion is premised upon enforcement of a consumer protection statute, public policy rather strongly supports the granting of a preliminary injunction. Stopping deceptive and unfair marketing practices – which have a tendency to dupe the citizenry into losing money – is very much in the public interest; permitting the Defendant to continue its willful violation of governing law is most certainly not in the public interest.

As noted by the *Livewirecyber, Inc.* Court, "The public interest is served… when a defendant is required to do no more than comply with the law." *Livewirecyber, Inc.*, 2017 WL 5640525, at *3. *See also*, *Envtl. Prot. Info. Ctr. v. Carlson*, ___ F.3d ___, 2020 WL 4433123, at



*6 (9th Cir. 2020) ("The public interest is served by requiring the Forest Service to comply with the law").

One of the reasons screenshots from the Defendant's advertisements are replicated herein is because words do not tend to do justice to the manipulative and unconscionable nature of these campaigns. Even a lawful and licensed casino running videos of this variety would almost assuredly be rapidly summoned before a regulatory body, enjoined, punished, and potentially suffer forfeiture of its license. *See, e.g.*, Nev. Gaming Reg. § 5.011(1)(d) (noting grounds for disciplinary action against a casino to include "[f]ailure to conduct advertising and public relations activities in accordance with decency, dignity, good taste, honesty, and inoffensiveness, including, without limitation, advertising that is false or materially misleading."); Nev. Gaming Reg. § 5A.155 ("An operator, including its employees or agents, shall be truthful and non-deceptive in all aspects of its interactive gaming advertising and promotions").

The Defendant's advertisements are, quite plainly, predatory – they create a wholesale fiction, altogether fail to note that gambling is involved (much less a probable loss of monies), and lure in a vulnerable public. If the Defendant were a lawful gaming operator subject to governing regulators, these advertisements would be prohibited by those regulations. That the Defendant escapes regulatory oversight by operating illegally does not excuse its conduct.

If the Defendant believes it has advertisements that comply with governing law, it is welcome to produce them as part of its opposition to this motion. And if the Defendant wishes to create legally-compliant advertisements in the future, those can be assessed once extant in nature (they would, no doubt, still cause appreciable harm to Jane Roe, but the public interest and balance of equities could be altered in such a scenario). For the time being, though, it



appears every single advertisement of the Defendant is nothing short of a fraud on the public; enjoining such activities thusly well accords with the public interest.

## V.    Conclusion

WHEREFORE, Jane Roe respectfully prays this Honorable Court (i) preliminarily enjoin the Defendant from advertising in the State of Colorado; (ii) direct her to post security in the amount of One Thousand Dollars and No Cents ($1,000.00) pursuant to Federal Rule of Civil Procedure 65(c); (iii) permit her counsel of record herein to provide the foregoing security from the funds of his law firm; and (iv) afford such other and further relief as may be just and proper.

Respectfully submitted,

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. 15346
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Telephone: 301-444-4600
Facsimile: 301-444-4600
Electronic Mail: mac@mbvesq.com
*Counsel for the Plaintiffs*

**[CERTIFICATE OF SERVICE ON FOLLOWING PAGE]**



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 16th day of August, 2020, I have caused a true and accurate copy of

the foregoing to be served on the following person via this Honorable Court's CM/ECF system:

> E. Leif Reid, Esq.
> Lewis Roca Rothgerber Christie LLP
> One East Liberty Street, Suite 300
> Reno, Nevada 89501-2128
> lreid@lrrc.com
> *Counsel for the Defendant*

<u>/s/ Maurice B. VerStandig</u>
Maurice B. VerStandig