E. LEIF REID, Bar No. 5750
LEWIS ROCA ROTHGERBER CHRISTIE LLP
One East Liberty Street, Suite 300
Reno, Nevada 89501-2128
Tel: 775.823.2900
Fax: 775.823.2929
lreid@lrrc.com

Attorneys for Defendant Skillz Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ALYSSA BALL,<br><br>JOHN PRIGNANO,<br><br>and<br><br>JANE ROE,<br><br>          Plaintiffs,<br><br>    vs.<br><br>SKILLZ INC.,<br><br>        Defendant. | CASE No. 2:20-cv-00888-JAD-BNW<br><br>**DEFENDANT SKILLZ INC.'S MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Hearing Date:  To be determined by Court<br>Hearing Time:  To be determined by Court |

Defendant Skillz Inc., by and through its undersigned counsel, hereby moves this Honorable Court for an order dismissing the First Amended Complaint as having been filed in violation of the parties' arbitration agreement pursuant to Federal Rule of Civil Procedure Rule 12(b)(1) and the Federal Arbitration Act §§ 1-16, or, in the alternative, dismissing certain counts of the First Amended Complaint for lack of standing pursuant to Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6).

This Motion is based upon the following Memorandum of Points and Authorities; the Declarations of Elliott Kaplan and Sofia Gleeson, filed concurrently herewith; the pleadings and papers on file in this action; argument as may be presented at or before the hearing; and all other matters of which the Court may take judicial notice.

DATED this 17th day of August, 2020.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

By: _/s/ E. Leif Reid_
E. Leif Reid, SBN 5750
One East Liberty Street, Suite 300
Reno, Nevada 89501

_Attorney for Defendant_

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ......................................................................................................................3

I.      THE PARTIES AND THEIR ARBITRATION AGREEMENTS .....................................3

II.     PLAINTIFFS BALL AND PRIGNANO ARE BANNED FOR CHEATING AND
        FILE THIS ACTION IN VIOLATION OF THE PARTIES' ARBITRATION
        AGREEMENTS .............................................................................................................6

III.    PLAINTIFFS FILE A FIRST AMENDED COMPLAINT ADDING PLAINTIFF
        "JANE ROE"..................................................................................................................7

ARGUMENT ...........................................................................................................................8

I.      THE FIRST AMENDED COMPLAINT MUST BE DISMISSED OR STAYED
        PURSUANT TO THE FEDERAL ARBITRATION ACT...................................................8

        A.      A Valid and Enforceable Arbitration Agreement Exists...........................................10

                1.      The Hyperlink Is In Sufficient Proximity to the Actionable Button
                        and Gives A Reasonable Opportunity To Read the Terms of Service.........11

                2.      The Arbitration Provisions Are Severable and Enforceable Apart
                        from the Rest of the Contract .....................................................................12

        B.      The Parties' Arbitration Agreement Delegates Questions About Its Scope
                To The Arbitrator—And Plaintiffs' Claims Are Clearly Within Its Scope .............14

II.     COUNTS X AND XI MUST BE DISMISSED FOR LACK OF ARTICLE III
        AND STATUTORY STANDING .....................................................................................17

CONCLUSION ........................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ASUS Computer Int'l v. InterDigital, Inc.*,
No. 15-CV-01716-BLF, 2015 WL 5186462 (N.D. Cal. Sept. 4, 2015) ............................. 9

*Ballentine v. United States*,
486 F.3d 806 (3d Cir. 2007) ..................................................................................... 17

*Ben & Jerry's Franchising, Inc. v. Porghavami*,
No. CV 07-2599-LEW-KJM, 2008 WL 744722 (E.D. Cal. Mar. 14, 2008) ................. 9-10

*Brennan v. Opus Bank, Corp.*,
796 F.3d 1125 (9th Cir. 2015) ............................................................................ 15, 16

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*,
622 F.3d 996 (9th Cir. 2010) .............................................................................. 12-13

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006) ....................................................................................... 12, 13, 14

*Buckley v. Gallo Sales Co.*,
949 F. Supp. 737 (N.D. Cal. 1996) ........................................................................... 9

*Carter v. Rent-A-Ctr., Inc.*,
No. 2:15-CV-00178-GMN, 2015 WL 4773547 (D. Nev. Aug. 13, 2015) ..................... 14

*Central Bank of Denver, NA v. First Interstate Bank of Denver, NA*,
511 U.S. 164 (1994) .............................................................................................. 19

*Chappel v. Laboratory Corp. of Am.*,
232 F.3d 719 (9th Cir. 2000) ................................................................................... 9

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) ........................................................................... 9, 17

*Chrysler Corp. v. Brown*,
441. U.S. 281 (1979) ............................................................................................ 19

*Cort v. Ash*,
422 U.S. 66 (1975) .............................................................................................. 19

*Doe v. Broderick*,
225 F.3d 440 (4th Cir. 2000) ................................................................................. 19

*Doe v. Swift Transp. Co.*,
No. 2:10-CV-00899 JWS, 2015 WL 274092 (D. Ariz. Jan. 22, 2015) .......................... 9

*Douglas v. Talk Am. Inc.*,
No. CV06-3809GAF(RCX), 2006 WL 5217301 (C.D. Cal. Oct. 20, 2006) ................... 10

*Dynegy Midstream Servs., Ltd. v. Apache Corp.*,
    294 S.W.3d 164 (Tex. 2009) ............................................................................ 16

*Fadal Machining Ctrs., LLC v. Compumachine, Inc.*,
    461 Fed. App'x 630 (9th Cir. 2011) ................................................................. 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ........................................................................................ 18

*Frudden v. Pilling*,
    842 F. Supp. 2d 1265 (D. Nev. 2012) ........................................................ 19, 20

*G.G. v. Valve Corp.*,
    799 Fed. Appx. 557 (9th Cir. 2020) ............................................................ 15, 16

*Geographic Expeditions, Inc. v. Estate of Lhotka*,
    599 F.3d. 1102 (9th Cir. 2010) .......................................................................... 9

*Godhart v. Tesla, Inc.*,
    No. 2:19-CV-01541-JAD-VCF, 2020 WL 2992414 (D. Nev. June 4, 2020) .................. 16

*Goldman, Sachs & Co. v. City of Reno*,
    747 F.3d 733 (9th Cir. 2014) ........................................................................... 11

*Harris v. United States*,
    841 F.2d 1097 (Fed. Cir. 1988) ......................................................................... 9

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    139 S. Ct. 524 (2019) ..................................................................................... 15

*Home Gambling Network, Inc. v. Piche*,
    No. CV 2:05-0610 DAE, 2007 WL 9734421 (D. Nev. 2007) ...................... 18-19

*HomeAdvisor, Inc. v. Waddell*,
    No. 05-19-00669-CV, 2020 WL 2988565 (Tex. App. June 4, 2020) ................ 12

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002) ......................................................................................... 15

*In re Palmdale Hills Prop., LLC*,
    654 F.3d 868 (9th Cir. 2011) ........................................................................... 17

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................ 18

*Marshall v. Rogers*,
    No. 218CV00078JADCWH, 2018 WL 2370700 (D. Nev. May 24, 2018) ....... 9, 10, 11, 16

*Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*,
    460 U.S. 1 (1983) ............................................................................................. 8

*Petrie v. GoSmith, Inc.*,
    360 F. Supp. 3d 1159 (D. Colo. 2019) ............................................................. 12

*Pettit v. Fed. Nat. Mortg. Ass'n,*
No. 2-11-CV-00149-JAD, 2014 WL 584876 (D. Nev. Feb. 11, 2014) ............................ 20

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
388 U.S. 395 (1967) ..................................................................................... 9, 12, 16

*Raebel v. Tesla, Inc.,*
No. 3:19-cv-00742-MMD-WGC, 2020 WL 1659929 (D. Nev. Apr. 3, 2020) ........... 10, 12

*Rent-A-Ctr., W., Inc. v. Jackson,*
561 U.S. 63 (2010) .............................................................................................. 12, 15

*Sargeant v. Dixon,*
130 F.3d 1067 (D.C. Cir. 1997) ............................................................................... 18

*Simula, Inc. v. Autoliv, Inc.,*
175 F.3d 716 (9th Cir. 1999) ................................................................................... 17

*Sommers v. Cuddy,*
No. 208-CV-00078-BES-RJJ, 2009 WL 873983 (D. Nev. Mar. 30, 2009) ...................... 13

*Steel Co. v. Citizens for a Better Environment,*
523 U.S. 83 (1998) ............................................................................................ 18, 19

*Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc.,*
368 F.3d 1053 (9th Cir. 2004) .................................................................................... 9

*Tompkins v. 23andMe, Inc.,*
840 F.3d 1016 (9th Cir. 2016) .................................................................................. 13

*Town of Silverton v. Phoenix Heat Source Sys., Inc.,*
948 P.2d 9 (Colo. App. 1997) ................................................................................... 16

*U.S. ex rel. Lighting & Power Servs., Inc. v. Inferface Constr. Corp.,*
553 F.3d 1150 (8th Cir. 2009) .................................................................................... 9

*Vernon v. Qwest Commc'ns Int'l, Inc.,*
857 F. Supp. 2d 1135 (D. Colo. 2012) ....................................................................... 10

*Vesta Corp. v. Amdocs Mgmt. Ltd.,*
No. 3:14-CV-1142-HZ, 2016 WL 3436415 (D. Or. June 16, 2016) ................................. 10

*W. Coast Stationary Eng'rs Welfare Fund v. City of Kennewick,*
39 Wash.App. 466, 694 P.2d 1101 (1985) .................................................................. 16

*Walker v. Neutron Holdings, Inc.,*
No. 1:19-CV-574-RP, 2020 WL 703268 (W.D. Tex. Feb. 11, 2020) ......................... 10, 12

*Welday v. Summerlin Life & Health Ins. Co.,*
127 Nev. 1185 (2011) .............................................................................................. 16

*White v. Lee,*
227 F.3d 1214 (9th Cir. 2000) .................................................................................. 17

*Wiseley v. Amazon.com, Inc.*,
    709 F. App'x 862 (9th Cir. 2017)...................................................................... 11

**Statutory Authorities**

9 U.S.C. §§ 1-16 ................................................................................................. 8

9 U.S.C. § 2 ................................................................................................... 8, 13

9 U.S.C. § 3 ..................................................................................................... 8, 9

18 U.S.C. § 1955 .............................................................................................. 18

28 U.S.C. § 2201 .............................................................................................. 19

35 U.S.C. § 5363 .............................................................................................. 18

Colo. Rev. Stat. § 18-10-103 ........................................................................... 18

Nev. Rev. Stat. § 463.160 ................................................................................ 18

Texas Penal Code § 47.03 ............................................................................... 18

Texas Penal Code § 47.05 ............................................................................... 18

**Rules and Regulations**

Fed. R. Civ. P. 12(b)(1) .............................................................................. 9, 17

Fed. R. Civ. P. 12(b)(6) ............................................................................ 19, 20

## MEMORANDUM OF POINTS AND AUTHORITIES

Skillz Inc. ("Skillz") respectfully submits this memorandum of law in support of its motion to dismiss the First Amended Complaint (the "FAC") as having been filed in violation of the parties' arbitration agreement or, in the alternative, to dismiss Counts X and XI, as to which Plaintiffs lack constitutional or statutory standing. In the face of a binding arbitration agreement, Plaintiffs filed a complaint in this Court so as to make false public allegations that would be protected by the litigation privilege in an improper attempt to extract money from Skillz. Plaintiffs' abuse of the court system should not be countenanced.

## PRELIMINARY STATEMENT

Skillz is one of the world's leading mobile games platforms, hosting skill-based esports competitions for tens of millions of players worldwide and distributing millions of dollars in prizes each month. Backed by leading venture capitalists, media companies, and professional sports leagues and franchises, Skillz has earned recognition as one of Forbes' Next Billion-Dollar Startups and CNBC's Disruptor 50.

Plaintiffs Alyssa Ball and John Prignano were, until recently, high-volume players of a solitaire-style game hosted by Skillz called 21 Blitz, in which participants can compete in paid entry competitions against other members of the Skillz community. Earlier this year, Skillz permanently banned Ball and Prignano from using any of its services, after an investigation determined that they were conspiring with each other to cheat on Skillz' platform. Skillz found that, among other things, Prignano and Ball threw games to one another to help themselves win cash prizes in league competitions. They also strategically aborted head-to-head games in a scheme to avoid losses by taking advantage of Skillz' policy of refunding entry fees to users who suffer a device malfunction or similar issue during a game. Prignano was also found to have engaged in pool-style hustling, *i.e.*, engaging in deliberately poor play in order to artificially lower his skill rating and secure matches against players of lesser ability. Such dishonest behavior violates Skillz' Terms of Service, and Skillz cannot and does not tolerate it, as Skillz is 100 percent committed to providing its player community with fair and level competition.

1   Ball's and Prignano's response to being banned was to file this action.  As experienced

2   gamers undoubtedly familiar with the maxim "the best defense is a good offense," they filed a

3   complaint full of allegations that are inflammatory and salacious – and false.  They spun a story in

4   which they are not cheaters, but victims who lost money to other supposed cheaters.  By their

5   fanciful account, Skillz made up pre-textual grounds to ban them to avoid having to refund their

6   losses and, in Mr. Prignano's case, having to redeem reward points he accrued for a car.

7   Ratcheting up their baseless offense even further, they also accused Skillz of running an "illegal

8   gambling racket."  After Skillz filed its motion to dismiss Ball's and Prignano's complaint in favor

9   of arbitration, Plaintiffs filed their FAC, which added "Jane Roe" as an additional plaintiff.

10   Plaintiffs' allegations are all nonsense and will be exposed as such if Plaintiffs are ever put

11   to their proof.  But if and when that happens, it cannot be in this Court, because Plaintiffs are party

12   to a valid, enforceable arbitration agreement with Skillz that requires any and all disputes arising

13   from or relating to Plaintiffs' use of Skillz' services to be resolved by binding arbitration before

14   the American Arbitration Association.  This arbitration agreement plainly extends to the claims in

15   Plaintiffs' FAC, all of which arise out of or relate to their play of 21 Blitz on Skillz' platform.

16   Pursuant to the Federal Arbitration Act, Plaintiffs must be compelled to arbitrate their claims.

17   In the alternative, even if Plaintiffs had not committed to arbitrate their claims (they had),

18   their declaratory judgment claims would be outside the Court's subject matter jurisdiction and/or

19   fail to state a claim.  Counts X and XI of the FAC are predicated on Skillz' supposed failure to

20   comply with state and federal gambling statutes.  These statutes are inapplicable to Skillz, which

21   hosts skill-based games, not gambling.  That aside, however, the statutes do not provide for a

22   private cause of action and, therefore, cannot support the grant of any remedy to Plaintiffs.  As

23   Counts X and XI seek a declaratory judgment that Skillz violated these statutes, this means that

24   Plaintiffs do not plead an Article III case or controversy sufficient to create subject matter

25   jurisdiction and also fail to state a claim.  Counts X and XI must, therefore, be dismissed even if

26   the entire FAC is not.

27

28

# BACKGROUND

## I.     The Parties And Their Arbitration Agreements

Skillz is one of the world's leading mobile games platforms.  Kaplan Decl.[1] ¶ 3.  It hosts numerous online skill-based games, such as 21 Blitz, in which players can compete for cash prizes in head-to-head matches or tournament-style play.  *Id.*

In order to play games on Skillz' platform, a user must first create a Skillz' account using a smartphone or other device.  *Id.* ¶ 4.  Ball created her Skillz account on April 25, 2019 under the username "Lysnico."  *Id.* ¶ 8.  Prignano created his account on January 8, 2018 under the username "Prignum42."  *Id.*  Roe created her first account on February 11, 2019 under the username Breadnbutter37.[2]  *Id.*  A user cannot participate in paid entry competitions on Skillz' platform unless their Skillz account has been saved.  *Id.* ¶ 9.  Prignano saved his account no later than January 2, 2019.  *Id.*  Ball saved her account no later than April 25, 2019.  *Id.*  Roe saved her first account no later than February 16, 2019.  *Id.*  In the course of saving their accounts, Ball, Prignano, and Roe each encountered the following screen:

---

[1]   Citations to "Kaplan Decl." are to the August 17, 2020 Declaration of Elliott Kaplan, filed herewith.

[2]   Roe created a total of three accounts.  Kaplan Decl. ¶ 7.  Roe saved her second account no later than November 17, 2019, and her third account no later than January 10, 2020.  *Id.* ¶¶ 8, 11.



*Id.* ¶ 4.  As shown above, directly below the button labeled "Next" was an advisory stating, "<u>By tapping 'Next', I agree to the Terms of Service and the Privacy Policy</u>."  *Id.* ¶ 5.  The underlined text in the advisory was a hyperlink, which, when clicked, brought the user to Skillz' Terms of Service and Privacy Policy.  *Id.* ¶ 5.

The introduction to the Terms of Service again advises that a user who registers for an account with Skillz or uses Skillz' services agrees to be bound by the Terms of Service:

> BY REGISTERING FOR AN ACCOUNT WITH US (your "Account"), USING
> THE SERVICES IN ANY WAY, CLICKING "I ACCEPT" BELOW,
> DOWNLOADING ANY APPLICATION INTEGRATED WITH SKILLZ'S
> SDK (as further defined in Section 2.2 below, "Software"), OR REGISTERING
> FOR OR PARTICIPATING IN ANY COMPETITIONS, YOU:
> (A) ACKNOWLEDGE THAT YOU HAVE READ THESE TERMS AND

CONDITIONS OF SERVICE AND ALL OBLIGATIONS AND RULES THAT MAY BE INCLUDED WITHIN EACH COMPETITION IN WHICH YOU PARTICIPATE ("Rules") (these Terms and Conditions of Service, the terms of any policy incorporated herein, and the Rules are collectively referred to as the "Terms") IN THEIR ENTIRETY; (B) AGREE TO BE BOUND BY THE TERMS; AND (C) ARE AUTHORIZED AND ABLE TO ACCEPT THESE TERMS. If you don't wish to be bound by the Terms, do not click "I accept" and do not register with Skillz ("Skillz", "we" or "us") and do not use the Services. Declining to accept these Terms means you will be unable to participate in Competitions or use your Skillz account.

Kaplan Decl. Ex. 3 (capitalization in original).  Ball, Prignano, and Roe each clicked "Next" and thereby agreed to Skillz' Terms of Service.  Kaplan Decl. ¶¶ 5, 9, 11.

The very first provision of the Terms of Service (Section 1.1) states – in all capital letters – that any and all claims arising out of or relating to Skillz' Terms of Service, software or services must be resolved through arbitration:

1.1.    ARBITRATION. TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, ANY CLAIM, DISPUTE OR CONTROVERSY OF WHATEVER NATURE ("CLAIM") ARISING OUT OF OR RELATING TO THESE TERMS AND/OR OUR SOFTWARE OR SERVICES MUST BE RESOLVED BY FINAL AND BINDING ARBITRATION IN ACCORDANCE WITH THE PROCESS DESCRIBED IN SECTION 14 BELOW. PLEASE READ SECTION 14 CAREFULLY. To the maximum extent permitted under applicable law, you are giving up the right to litigate (or participate in as a party or class member) all disputes in court before a judge or jury.

Kaplan Decl. Ex. 3 § 1.1 (capitalization in original).

Section 14 of the Terms of Service reiterates that any Dispute between Skillz and one of its account holders, if not resolved through negotiation or in small claims court, must be submitted to binding arbitration.  *Id.* § 14.  The term "Dispute" is defined as "any dispute, action or other controversy between you and us concerning these Terms, the Services or any product, service or information we make available to you, whether in contract, warranty, tort, statute, regulation, ordinance or any other legal or equitable basis."  *Id.*  For account holders who, like Ball, Prignano and Roe, are located in the United States, arbitration is to be conducted in San Francisco by the American Arbitration Association under its Commercial Arbitration Rules.  *Id.* § 14.4.  Though Skillz' Terms of Service have been amended since Plaintiffs saved their Skillz accounts, the

aforementioned provisions relating to arbitration have been in force and unchanged at all times from the inception of their accounts through the present.  Kaplan Decl. ¶ 10, Exs. 3, 4.

## II.   Plaintiffs Ball and Prignano Are Banned For Cheating And File This Action In Violation Of The Parties' Arbitration Agreements

As alleged in the FAC, Ball and Prignano played 21 Blitz frequently and increased their skill level over time.  FAC ¶¶ 36-37, 57, 60.  Prior to being banned, Ball and Prignano were both playing 21 Blitz for high dollars, competing in paid entry competitions with entry fees, on average, of hundreds of dollars each game.  *Id.* ¶¶ 37, 60.  There was a relatively small pool of players who played at that level.  *Id.* ¶ 39.  Ball and Prignano exploited that fact to collude with one another to cheat other high-dollar players on the platform.  Kaplan Decl. ¶ 15.

Skillz maintains a loyalty program, through which players earn "Ticketz" based on the frequency of their play, which can be redeemed for prizes.  *Id.* ¶ 12.  Prignano, who played tens of thousands of 21 Blitz and other games, accumulated a large amount of Ticketz and, in or about August 2019, attempted to redeem them for Skillz' top prize, a Porsche Boxster.  FAC ¶¶ 61-63. At about this same time, Skillz received complaints from Skillz community members about Prignano's gameplay, and investigated those complaints.  Kaplan Decl. ¶ 13.  Notably, in the course of the investigation, Prignano reiterated his assent to Skillz' Terms of Service in email correspondence.  *Id.*; Kaplan Decl. Ex. 5.  Prignano satisfied initial tests to show that his performance was consistent with his level of skill, but other players provided information to Skillz in the form of text messages indicating that Prignano had been strategically aborting games in order to avoid losses, which Skillz confirmed through the use of analytics.  Kaplan Decl. ¶ 14. Other text messages provided to Skillz evidenced that Prignano had colluded with Ball to manipulate the results of tournament play by throwing games, which analytics again confirmed. *Id.* ¶ 15.  Such conduct violates Skillz' Terms of Service, which prohibits cheating, fraud, and abuse.  *Id.* ¶ 16.  Accordingly, based on the findings of its investigation,[3] Skillz notified Prignano on March 13, 2020 that he had been permanently banned from Skillz' platform and that his

---

[3]   The above is not intended to fully describe the scope and findings of Skillz' investigation of Plaintiff Ball's and Prignano's illicit activities.

1    winnings would be forfeited and/or subject to recoupment.  *Id.* ¶ 17.  Ball was given the same

2    notice on April 28, 2020.  *Id.* ¶ 18.  Prior to that notice, Skillz' Head of VIP Programs and

3    Technical Support spoke to Ball by telephone on April 17, 2020.  Gleeson Decl.[4] ¶¶ 3-7.  During

4    that telephone call, Ball expressed familiarity with Skillz' Terms of Service.  *Id.* at ¶ 7.

5        Plaintiffs responded to being banned by filing this action on May 17, 2020.  The gist of

6    Plaintiffs Ball's and Prignano' allegations is that they collectively lost approximately $2,000,000

7    to other 21 Blitz users who cheated, and Skillz banned Plaintiffs on pretextual grounds to avoid

8    having to refund them those losses.

9    **III.    Plaintiffs File A First Amended Complaint Adding Plaintiff "Jane Roe"**

10       Plaintiffs filed an amended complaint on July 20, 2020, which, among other things, added

11   a third plaintiff designated publicly as "Jane Roe."  Roe states that she learned of this action

12   through the press Plaintiffs' counsel generated (*see* FAC ¶116) by filing Ball's and Prignano's

13   false allegations publicly in this court in violation of the parties' arbitration agreements.  Unlike

14   Plaintiff Ball, who states that she "form[ed] effective strategies" (*id.* ¶ 37) to earn funds by playing

15   21 Blitz, and Plaintiff Prignano, who states that he "gain[ed] a mastery of 21 Blitz, and then

16   proceeded to earn significant monies" (*id.* ¶ 60), Plaintiff Roe alleges that she did not earn

17   significant funds by playing 21 Blitz (*see id.* ¶ 103).  Rather, Roe alleges that she lost

18   approximately $60,000 to other 21 Blitz users over the course of seven months.  *Id.*

19       Promoting sensible gaming is part of Skillz' culture, and Skillz leadership team is

20   committed to promoting responsible behavior among Skillz players.  Kaplan Decl. ¶ 19.  Skillz

21   takes steps to detect and deter overspending on the Skillz platform.  *Id.*  In December 2019, Skillz

22   detected overspending by Roe.  Gleeson Decl. ¶ 8.  Accordingly, in December 2019 and January

23   2020, Skillz temporarily and then permanently closed Roe's Skillz account to prevent further

24   spending by Roe, and refunded to Roe all deposits she had made in December 2019, in the amount

25   of $13,580.  *Id.*  When Roe later opened another Skillz account (using another email address) so as

26

27   _____

28       [4]  Citations to "Gleeson Decl." are to the August 17, 2020 Declaration of Sofia Gleeson, filed
     herewith.

to continue to spend on playing 21 Blitz, Skillz detected it, and, by the next day, closed Roe's new account to prevent further spending.  Kaplan Decl. ¶ 8 nn. 1, 2.  Roe is no longer allowed on the Skillz platform.  *Id.* ¶ 8 n.1.

Every one of the FAC's eleven asserted claims concerns Skillz' Terms of Service, Skillz' products and/or services, and/or Plaintiffs' use thereof.  FAC ¶¶ 132-216.  Plaintiffs' original Complaint made no mention of the parties' arbitration agreement.  Plaintiffs' FAC – filed after Skillz filed its first motion to dismiss this action in favor of arbitration – fully acknowledges that, when saving a Skillz account, Skillz users like Plaintiffs are advised that by tapping "Next," the user is agreeing to Skillz' Terms of Service.  FAC ¶ 119.

## ARGUMENT

### I.  THE FIRST AMENDED COMPLAINT MUST BE DISMISSED OR STAYED PURSUANT TO THE FEDERAL ARBITRATION ACT

Given that there is an arbitration agreement between the parties, Plaintiffs' FAC must be dismissed or stayed pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1-16, because all of the claims asserted in the FAC fall within the scope of the parties' arbitration agreement.

Section 2 of the FAA provides that:

> A written provision in . . . a contract evidencing a transaction involving commerce[5] to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements . . . ."  *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983).

Section 3 of the FAA puts teeth in Section 2 and directs Courts to enforce it when asked to do so:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such

---

[5] There is no dispute that conduct alleged in the FAC constitutes interstate commerce.  *See, e.g.*, FAC ¶¶ 9-11, 13, 37, 60, 77.

> arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

This Court, in a recent case, summarized the mandatory nature of the FAA and the manner in which courts must apply it:

> By its terms, the [FAA] "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." "The court's role under the [FAA] is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." The party seeking to compel arbitration has the burden to show that both of these questions must be answered in the affirmative. "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms."

*Marshall v. Rogers*, No. 218CV00078JADCWH, 2018 WL 2370700, at *2 (D. Nev. May 24, 2018) (internal citations omitted); *see also Prima Paint Corp. v. Flood & Conklin Mfr. Co.*, 388 U.S. 395, 400 (1967); *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Although the FAA speaks in terms of staying a case covered by an arbitration agreement, the Ninth Circuit has held that courts may dismiss a case where the complaint includes only claims subject to arbitration. *See Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1060 (9th Cir. 2004); *Chappel v. Laboratory Corp. of Am.*, 232 F.3d 719, 725 (9th Cir. 2000).[6]

---

[6] Federal Rule of Civil Procedure 12(b)(1) is a proper vehicle to move to stay or dismiss arbitrable claims. *See, e.g., Geographic Expeditions, Inc. v. Estate of Lhotka*, 599 F.3d. 1102, 1106-07 (9th Cir. 2010); *U.S. ex rel. Lighting & Power Servs., Inc. v. Inferface Constr. Corp.*, 553 F.3d 1150, 1152 (8th Cir. 2009); *Harris v. United States*, 841 F.2d 1097, 1099 (Fed. Cir. 1988); *Buckley v. Gallo Sales Co.*, 949 F. Supp. 737, 739-40 (N.D. Cal. 1996); *ASUS Computer Int'l v. InterDigital, Inc.*, No. 15-CV-01716-BLF, 2015 WL 5186462, at *2 (N.D. Cal. Sept. 4, 2015); *Doe v. Swift Transp. Co.*, No. 2:10-CV-00899 JWS, 2015 WL 274092, at *4 (D. Ariz. Jan. 22, 2015); *Ben & Jerry's Franchising, Inc. v. Porghavami*, No. CV 07-2599-LEW-KJM, 2008 WL

---

### A. A Valid and Enforceable Arbitration Agreement Exists

In this case, it is indisputable that a valid and enforceable agreement to arbitrate exists.  As detailed above, Ball, Prignano, and Roe each assented to Skillz' Terms of Service at the time they clicked on the "NEXT" button and saved their Skillz accounts (*see* supra at pp. 3-5, *see also* FAC ¶¶ 117-19).  The Terms of Service expressly specify that "any dispute, action or other controversy between [Plaintiffs] and [Skillz] concerning these Terms, the Services or any product, service or information [Skillz] make[s] available to [Plaintiffs], whether in contract, warranty, tort, statute, regulation, ordinance or any other legal or equitable basis" is subject to mandatory, binding arbitration before the American Arbitration Association under its Commercial Arbitration Rules." Kaplan Decl. Ex. 3.

Agreements formed in this manner – through a user taking an action in an app or website expressly conditioned on his or her assent to terms made electronically available for review – are valid and enforceable.  *See, e.g.*, *Raebel v. Tesla, Inc.*, No. 3:19-cv-00742-MMD-WGC, 2020 WL 1659929, at *3-4 (D. Nev. Apr. 3, 2020) (valid arbitration agreement formed under Nevada law where defendant clicked "Place Order" button that was a legend stating "[b]y clicking 'Place Order' I agree to the Model 3 Order Agreement" and legend contained a hyperlink to the agreement); *Walker v. Neutron Holdings, Inc.*, No. 1:19-CV-574-RP, 2020 WL 703268, at *4 (W.D. Tex. Feb. 11, 2020) (valid arbitration agreement formed under Texas law where "a reasonable user would view the . . . sign-in screen and see that the [Terms of Service] is part of the offer to proceed with the transaction by clicking 'NEXT'"); *see also Marshall*, 2018 WL 2370700, at *3 (valid arbitration agreement formed under California law where "users were informed that, by signing up for an Airbnb account, they were agreeing to the TOS, which was hyperlinked in the sign-up screen so users could click and read the full document before committing"); *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149-50 (D. Colo. 2012) (valid agreement

_____

744722, at *1 (E.D. Cal. Mar. 14, 2008); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, No. 3:14-CV-1142-HZ, 2016 WL 3436415, at *4 (D. Or. June 16, 2016); *Douglas v. Talk Am. Inc.*, No. CV06-3809GAF(RCX), 2006 WL 5217301, at *1 (C.D. Cal. Oct. 20, 2006).

formed when the customers take an affirmative action such as "pressing a 'click' button" despite the terms being available only in a hyperlink).[7]

Plaintiffs attempt to escape their respective arbitration agreements by alleging that, because the hyperlink containing the Terms of Service was below the "NEXT" button on which a consumer clicked, "a consumer [who] reads a screen from top to bottom . . . will never see [the hyperlink]."  FAC ¶ 121.  Plaintiffs never allege, however, that *they* never saw the hyperlink—or the Terms of Service, for that matter.  Nor could they.  Both Ball and Prignano have expressly recognized their familiarity with the Skillz Terms of Service in telephone and email communications with Skillz employees (*see supra* at pp. 6-7), and Roe created three Skillz accounts (Kaplan Decl. ¶ 7), and thus encountered the hyperlink (which stated, "By tapping 'Next', I agree to the <u>Terms of Service and the Privacy Policy</u>") no less than three times.

### 1.  The Hyperlink Is In Sufficient Proximity to the Actionable Button and Gives A Reasonable Opportunity To Read the Terms of Service

As shown in the screenshot above, the allegation that the hyperlink is not easily observable is demonstrably untrue.  The hyperlink containing the Terms of Service is directly underneath the "NEXT" button, readily apparent to a consumer looking at the button.  The screen is uncluttered and is visible in its entirety at all times with no scrolling necessary.  *See supra* at p. 4 (the screenshot).  The text of the hyperlink is a dark color against a beige background.

The Ninth Circuit and the District of Nevada have expressly found that Terms of Service in hyperlinks, like the one at issue here, that are "in sufficient proximity" to the actionable button give consumers "a reasonable opportunity" to read and understand the terms, and are, therefore, valid and enforceable.  *See, e.g.*, *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1068 (S.D. Cal. 2015), *aff'd sub nom. Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862 (9th Cir. 2017)

---

[7]  "'When determining whether parties have agreed to submit to arbitration,' federal courts 'apply general state-law principles of contract interpretation, while giving due regard to federal policy in favor of arbitration by resolving ambiguities as to scope of the arbitration in favor of arbitration.'"  *Marshall*, 2018 WL 2370700, at *2 (quoting *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (internal quotation marks and quoted references omitted)).

(plaintiffs bound by Amazon's Condition of Use, and the arbitration agreement contained therein, which was hyperlinked in the text directly below the "Place Your Order" button); *see also Raebel*, 2020 WL 1659929, at *3-4 (valid arbitration agreement under Nevada law where "Place Order" button was in close proximity to legend stating "[b]y clicking 'Place Order' I agree to the Model 3 Order Agreement"); *Walker*, 2020 WL 703268, at *4; *HomeAdvisor, Inc. v. Waddell*, No. 05-19-00669-CV, 2020 WL 2988565, at *4 (Tex. App. June 4, 2020) (hyperlink placed directly beneath the actionable button is sufficiently conspicuous to give users a reasonable notice); *Petrie v. GoSmith, Inc.*, 360 F. Supp. 3d 1159, 1162 (D. Colo. 2019) (finding hyperlink to the Terms of Use, which was embedded in the acknowledgement text next to the actionable button, was sufficient to put plaintiffs on reasonable notice).

The hyperlink containing Skillz' Terms of Service is, therefore, sufficiently conspicuous to put Plaintiffs on reasonable notice.  By affirmatively clicking on "NEXT," each of the Plaintiffs manifested assent to, and are therefore bound by, the Terms of Service and the arbitration provisions contained therein.

### 2. The Arbitration Provisions Are Severable and Enforceable Apart from the Rest of the Contract

Plaintiffs do not dispute that there are arbitration provisions contained in the Terms of Service.  Instead, they contend that the arbitration provisions are unenforceable because Skillz' Terms of Service, as a whole, are invalid as being "against public policy."  FAC ¶¶ 203-208. Controlling federal arbitration law rejects this attempt by Plaintiffs to evade their arbitration agreements as well.

It has long been settled that "an arbitration provision is severable from the remainder of the contract," and, unless a party challenges the arbitration clause itself, "the issue of the contract's validity is considered by the arbitrator in the first instance."  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006); *see also Prima Paint Corp.*, 388 U.S. at 406-07 (whether a contract as a whole was fraudulently induced is an issue to be decided by an arbitrator, not a court); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) ("[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a

specific agreement to arbitrate."); *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1000 (9th Cir. 2010) ("[W]hen a plaintiff's legal challenge is that a contract as a whole is unenforceable, the arbitrator decides the validity of the contract.").

This general rule is applicable where, as here, the plaintiff challenges the *entire* contract to be "*void ab initio*" (FAC ¶ 206) for purported illegality or other reason.  In *Buckeye*, the plaintiffs alleged that their agreement with defendant Buckeye Check Cashing, Inc. "violated various Florida lending and consumer-protection laws, rendering it criminal on its face."  *Buckeye*, 546 U.S. at 443.  In bringing this allegation, the plaintiffs challenged the validity of the entire agreement, claiming that it is "illegal" and "*void ab initio*."  *Id.* at 443.  Reversing the decision by the Florida Supreme Court, the United States Supreme Court refused to accept that the "enforceability of the arbitration agreement should turn on Florida public policy and contract law." *Id.* at 446 (internal quotation omitted).  Rather, an arbitration agreement is severable from and of "equal-footing" with the remainder of the contract.  *Id.* at 447.  Thus, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator." *Id.* at 445-46.

Because the plaintiffs in *Buckeye* challenged the agreement in its entirely without challenging the arbitration clause separately, the Court held that the "[arbitration] provisions are enforceable apart from the remainder of the contract."  *Id.* at 446; *see also Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1032 (9th Cir. 2016) ("[I]f the plaintiff does not specifically and directly challenge the 'precise agreement to arbitrate at issue,' a court must treat the arbitration agreement as valid under [FAA] § 2 and enforce it, thereby letting the arbitrator decide questions as to the validity of other provisions in the first instance.  This rule applies even when the plaintiff challenges the contract on 'a ground that directly affects the entire agreement . . . or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.'") (citing *Buckeye*, 546 U.S. at 444) (internal citation omitted); *Sommers v. Cuddy*, No. 208-CV-00078-BES-RJJ, 2009 WL 873983, at *3 (D. Nev. Mar. 30, 2009) ("Plaintiffs' argument that Plaintiffs are challenging the enforcement of the contract as a whole and not just the arbitration provision . . . . [A]ccording to the United States Supreme Court, 'unless the challenge is to the arbitration

-13-        Case No.    2:20-cv-00888-JAD-BNW

clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.'") (citing *Buckeye*, 546 U.S. at 444); *Carter v. Rent-A-Ctr.*, Inc., No. 2:15-CV-00178-GMN, 2015 WL 4773547, at *2 (D. Nev. Aug. 13, 2015) ("Plaintiff challenges the invalidity of the [entire Agreement] . . . . Therefore, Plaintiff's challenges to the validity of the Agreement as a whole must go to the arbitrator.").

Here, too, the arbitration provisions are severable from the rest of the parties' agreements regarding the Terms of Service.  None of Plaintiffs' theories challenges the validity of the arbitration provisions.  Rather, Plaintiffs' arguments against the enforceability of the arbitration provisions all hinge on the validity of the *entire* agreement to the Terms of Service.  Plaintiffs allege that Skillz' "Terms of Service are *void ab initio* as being in the nature of an illegal contract existing against public policy," and that the arbitration provisions are invalid because "the Terms of Service are *void ab initio*."  FAC ¶ 206; *see also id.* ¶ 208 ("The Plaintiffs maintain the arbitration clause is invalid because (i) the ***Terms of Service are void ab initio***; (ii) the doctrine of severability does not apply to ***a contract that is void ab initio***; (iii) the doctrine of severability is inapplicable . . . because the ***whole purpose of the Terms of Service*** is . . . unlawful . . . ; (iv) there has been no meeting of minds since ***the Terms of Service*** were not presented to the Plaintiffs . . . ; (v) there has been no affirmative act of acceptance . . . [of] ***the Terms of Services***; and (vi) there is no valid consideration for . . . ***the Terms of Service*** . . . .") (emphasis added).

*Buckeye* and its progeny make clear that the doctrine of severability is applicable here. Because Plaintiffs do not specifically challenge the validity of the arbitration provisions, the arbitration provisions are enforceable separately from the remainder of the Terms of Service, and, any issue regarding the validity of the remainder of the Terms of Service must be decided by an arbitrator, not this Court.

### B.   The Parties' Arbitration Agreement Delegates Questions About Its Scope To The Arbitrator—And Plaintiffs' Claims Are Clearly Within Its Scope

It is also indisputable that Plaintiffs' claims fall within the scope of the parties' arbitration agreement.  The Court need not address that question in this case, however, because, by agreeing to the American Arbitration Association ("AAA")'s Commercial Rules, the parties delegated the

question of arbitrability to the arbitrators.  They did so by agreeing to the AAA's Commercial Rules of Arbitration, which provide that "[t]he arbitrator shall have the power to rule on his or her jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  AAA Commercial Arbitration Rules, R-7(a).

The United States Supreme Court has determined "that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."  *Rent-A-Ctr.*, 561 U.S. at 68-69.  "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  *Id.* at 70.  If the parties have "clearly and unmistakably" agreed that questions of arbitrability must be decided by the arbitrator, such provisions must be enforced.  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.").

The Ninth Circuit has repeatedly held that parties who agree to the rules of the American Arbitration Association agree to delegate questions concerning the scope of their arbitration agreement and whether it covers particular claims to the arbitrator.  *See Fadal Machining Ctrs., LLC v. Compumachine, Inc.*, 461 Fed. App'x 630, 632 (9th Cir. 2011) (incorporation of the AAA rules into an arbitration agreement "shows a clear and unmistakable intent to delegate questions of scope to the arbitrator"); *Brennan v. Opus Bank, Corp.*, 796 F.3d 1125, 1130 (9th Cir. 2015) ("[W]e hold that incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."); *G.G. v. Valve Corp.*, 799 Fed. Appx. 557,

558 (9th Cir. 2020) (finding a teenager had "clearly and unmistakably agreed to arbitrate questions of arbitrability because the arbitration agreement incorporates AAA Rules").[8]

Finally, even if the parties had not delegated questions of arbitrability to the arbitrator, the language of their arbitration agreement leaves no doubt that it covers the claims asserted in Plaintiffs' FAC.  Section 1.1 of Skillz' Terms of Service extends the parties' arbitration agreement to "any claim, dispute or controversy of whatever nature ("claim") arising out of or relating to these terms and/or our software or services."  Kaplan Decl. Ex. 3.  Section 14.1 further extends the arbitration agreement to "any dispute, action or other controversy between you and us concerning these Terms, the Services or any product, service or information we make available to you, whether in contract, warranty, tort, statute, regulation, ordinance or any other legal or equitable basis."  *Id.*

Courts regularly recognize that such broad terms reach all claims having any connection to the relationship between the parties.  *See, e.g.*, *Godhart v. Tesla, Inc.*, No. 2:19-CV-01541-JAD-VCF, 2020 WL 2992414, at *4 (D. Nev. June 4, 2020) (arbitration clause applicable to "any disputes arising out of or relating to" held "broad enough to encompass" all the claims advanced by the plaintiff); *Prima Paint Corp.*, 388 U.S. at 398, 406 (arbitration clause that contains "any

---

[8]  In *Marshall*, this Court raised but did not decide the question of whether the ruling of *Brennan* should apply to consumer contracts where one party is potentially less sophisticated than the other party.  *See Marshall*, 2018 WL 2370700 at *7.  The Ninth Circuit subsequently answered this question in the affirmative in *Valve Corp.*, in which it held that a group of "teenagers clearly and unmistakably agreed to arbitrate questions of arbitrability because the arbitration agreement incorporates AAA rules."  799 Fed. Appx. at 558.  The court explained that "[t]he parties' degree of sophistication does not change this conclusion because, under Washington law, '[c]ourts presume that parties to an agreement have read all parts of the entire contract and intend what is stated in its objective terms[.]'"  *Id.* (citing *W. Coast Stationary Eng'rs Welfare Fund v. City of Kennewick*, 39 Wash.App. 466, 694 P.2d 1101, 1104 (1985)).  Of course, this hornbook principle of contact law – that parties are presumed to have read the contracts they sign and meant to be bound by their terms – is the same regardless of which state law is applied to the parties' contract here.  *See, e.g.*, *Welday v. Summerlin Life & Health Ins. Co.*, 127 Nev. 1185 (2011) ("We give contractual terms their plain and ordinary meaning."); *Dynegy Midstream Servs., Ltd. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) ("We give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning."); *Town of Silverton v. Phoenix Heat Source Sys., Inc.*, 948 P.2d 9, 11 (Colo. App. 1997) ("In determining the intent of contracting parties, we must give the terms of the contract their plain and ordinary meaning.").

controversy or claim arising out of or relating to this agreement" is "easily broad enough to encompass [plaintiff's] claim"); *Chiron Corp.*, 207 F.3d at 1131 (arbitration agreement that contains "[a]ny dispute, controversy, or claim arising out of or relating to" is "broad and far reaching"); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) ("[T]he language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract.").

In this case, Plaintiffs' agreement to arbitrate claims of any kind or nature "arising out of or relating to" or "concerning" Skillz' Terms of Service, products or services unquestionably reaches all of the claims asserted in their FAC.  All of their alleged claims arise from, relate to, and concern Plaintiffs' use of Skillz' products and services – *i.e.*, their playing of 21 Blitz and other Skillz' games on Skillz' platform – after assenting to Skillz' Terms of Service.  FAC ¶¶ 132-216.

Accordingly, because Plaintiffs are party to a valid arbitration agreement that delegates questions of arbitrability to an arbitrator, the FAA, as interpreted by the Supreme Court, the Ninth Circuit, and this Court, requires the Court to enforce the arbitration agreement and dismiss Plaintiffs claims in favor of arbitration.

## II.   COUNTS X AND XI MUST BE DISMISSED FOR LACK OF ARTICLE III AND STATUTORY STANDING

In the event the Court does not dismiss Plaintiffs' entire FAC pursuant to the FAA, the Court must dismiss Counts X and XI pursuant to Rule 12 (b)(1) for lack of subject matter jurisdiction, as Plaintiffs do not have the requisite Article III standing.  Article III standing is a necessary component of subject matter jurisdiction and is "properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) . . . ."  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000); *see also In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011) ("Article III standing is a necessary component of subject matter jurisdiction."); *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) ("A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.").

To have Article III standing, Plaintiffs must show (1) they have suffered an "injury in fact," *i.e.*, an actual or imminent injury that is concrete and particularized; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is likely, as opposed to merely speculative, that "the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). An "injury in fact," requires an invasion of a "legally cognizable interest," which "means an interest recognized at common law or specifically recognized as such by the Congress." *Sargeant v. Dixon*, 130 F.3d 1067, 1069 (D.C. Cir. 1997). To establish redressability, Plaintiffs must allege clear and specific facts showing that it is likely that the relief sought will remedy plaintiff's injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The redressability requirement is not met if the relief sought "does not remedy the injury suffered." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998).

Without conceding that Plaintiffs satisfy *any* of the requirements for Article III standing with respect to Counts X and XI, they clearly fail to satisfy the redressability requirement. Count XI seeks a declaratory judgment that Skillz' "operation of the 21 Blitz app" violates certain criminal statutes of Texas, Colorado, and the United States relating to gambling, as well as Section 463.160 of the Nevada Gaming Statutes, which states it is "unlawful" to "expose for play . . . any gambling game . . . without having first procured... all federal, state, county and municipal gaming licenses or registrations." FAC at 22. Count X seeks a declaratory judgment that the Skillz Terms of Service are invalid and not binding on Plaintiffs due to the alleged violation of these same statutes. Even if granted, the requested declarations that Skillz violates the cited gambling statutes (and, to be clear, Skillz does not) would do nothing at all to redress the only injury Plaintiffs allege in their complaint – their supposed monetary injury resulting from their past play of 21 Blitz and from Skillz' refusal to disburse their account balances. None of the statutes cited in Counts X and XI provide for a private cause of action or other mechanism through which Plaintiffs could recover these allegedly lost sums by proving a violation. 35 U.S.C. § 5363; 18 U.S.C. § 1955; Texas Penal Code §§ 47.03, 47.05; Colo. Rev. Stat. § 18-10-103; Nev. Rev. Stat. § 463.160; *see also Home Gambling Network, Inc. v. Piche*, No. CV 2:05-0610 DAE, 2007 WL 9734421 at *8

(D. Nev. 2007) (holding there is no private cause of action allowed under Nevada Gaming Statutes).[9]  The only thing Plaintiffs could gain from succeeding on Count XI, for example, is whatever "comfort or joy" they might derive from showing that Skillz' violated the law, but the Supreme Court has held that such "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury."  *Steel Co.*, 523 U.S. at 107.  Counts X and XI must, therefore, be dismissed for lack of Article III standing.

In addition, because Plaintiffs seek declaratory judgments that Skillz violated statutes that do not vest Plaintiffs with a private right of action, Counts X and XI also fail to state a claim upon which relief can be granted, and should be dismissed pursuant to Rule 12(b)(6) as well.  Fed. R. Civ. P. 12(b)(6); *see also* 28 U.S.C. § 2201; *Frudden v. Pilling*, 842 F. Supp. 2d 1265, 1279-80 (D. Nev. 2012) ("[E]ven assuming Plaintiffs are correct that the Policy and its adoption did not comply with section 392.4644, they have no private right of action to enforce such a grievance.  Nor can they rely on the declaratory judgment statutes.  Where there is no private right of action, there is no jurisdiction to entertain a request for a declaration under 28 U.S.C. § 2201; to hold otherwise would 'evade the intent of [a legislature] not to create private rights of action under those statutes and would circumvent the discretion entrusted to the executive branch in deciding how and when to enforce those statutes.") (citation omitted).

Moreover, Count X is nothing more than Plaintiffs' attempt to file a preemptive opposition to Skillz motion to dismiss this action in favor of arbitration.  As this Court has held, "a 'claim' for

---

[9]  *See also Chrysler Corp. v. Brown*, 441. U.S. 281, 316 (1979) ("In *Cort v. Ash*, 422 U.S. 66 (1975), we noted that this Court has rarely implied a private right of action under a criminal statute, and where it has done so 'there was at least a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone.'"); *Doe v. Broderick*, 225 F.3d 440, 447-48 (4th Cir. 2000) ("The Supreme Court historically has been loath to infer a private right of action from 'a bare criminal statute,' because criminal statutes are usually couched in terms that afford protection to the general public instead of a discrete, well-defined group.")(citation omitted); *Central Bank of Denver, NA v. First Interstate Bank of Denver, NA*, 511 U.S. 164, 190-91 (1994) ("There would be no logical stopping point to this line of reasoning:  Every criminal statute passed for the benefit of some particular class of persons would carry with it a concomitant civil damages cause of action.  This approach, with its far-reaching consequences, would work a significant shift in settled interpretive principles regarding implied causes of action.  We are unwilling to reverse course in this case.") (citation omitted).

1 declaratory relief is not a substantive cause of action . . . it is merely a prayer for a remedy." *Pettit*

2 *v. Fed. Nat. Mortg. Ass'n*, No. 2-11-CV-00149-JAD, 2014 WL 584876, at *4 (D. Nev. Feb. 11,

3 2014); *see also Frudden*, 842 F. Supp. 2d at 1280 ("The availability of relief under the Declaratory

4 Judgment Act 'presupposes the existence of a judicially remediable right.'").  Just as there is no

5 private cause of action under the statutes cited by Plaintiffs in Counts X and XI, there is no cause

6 of action to "inform the venue in which this suit is adjudicated" as Plaintiffs seek in Count X.

7 (FAC ¶ 210.)  Plaintiffs fail to state a claim under the Declaratory Judgment Act for this reason as

8 well.  Therefore, Counts X and XI must be dismissed pursuant to Rule 12(b)(6).

9

## CONCLUSION

10   For the foregoing reasons, the Court should dismiss the FAC in favor of arbitration for lack

11 of subject matter jurisdiction or, in the alternative, dismiss Counts X and XI of the FAC for lack

12 of subject matter jurisdiction and/or failure to state a claim.

13   DATED this 17th day of August, 2020.

14        LEWIS ROCA ROTHGERBER CHRISTIE LLP

15

16        By:  */s/ E. Leif Reid*
          E. Leif Reid, SBN 5750

17          One East Liberty Street, Suite 300
          Reno, Nevada 89501

18

19          *Attorney for Defendant*

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b), I certify that I am an employee of Lewis Roca Rothgerber Christie LLP, and that on this date, I caused the foregoing **DEFENDANT SKILLZ INC.'S MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS** to be served by electronically filing the foregoing with the CM/ECF electronic filing system, which will send notice of electronic filing to the following:

> Maurice VerStandig
> The VerStandig Law Firm, LLC
> 1452 W. Horizon Ridge Pkwy, #665
> Henderson, Nevada 89012
> mac@mbvesq.com

DATED this 17th day of August, 2020.

/s/ Autumn D. McDannald
An Employee of Lewis Roca Rothgerber Christie LLP

1

## INDEX OF EXHIBITS

| Exhibit No. | Description | No. of Pages |
|---|---|---|
|  | Declaration of Sofia Gleeson in Support of Defendant Skillz Inc.'s Motion to Compel Arbitration and Motion to Dismiss Plaintiffs' First Amended Complaint | 3 |
|  | Declaration of Elliott Kaplan in Support of Defendant Skillz Inc.'s Motion to Compel Arbitration and Motion to Dismiss Plaintiffs' First Amended Complaint | 8 |
| 1 | Email exchange between Skillz Inc. and Plaintiff John Prignano on March 13, 2020 | 3 |
| 2 | Email exchange between Skillz Inc. and Plaintiff Alyssa Ball on April 28, 2020 | 3 |
| 3 | Skillz' Terms of Service (updated Sept. 21, 2017) | 18 |
| 4 | Skillz' Terms of Service (updated Oct. 10, 2019) | 68 |
| 5 | Email exchange between Skillz Inc. and Plaintiff John Prignano on January 14, 2020 | 3 |