**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Alyssa Ball, et al. | Case No.: 2:20-cv-00888-JAD-BNW |
| Plaintiffs | **Order Granting Motion to Compel Arbitration, Denying Motions to Dismiss and for a Preliminary Injunction, and Overruling Objection** |
| v. | |
| Skillz Inc., | [ECF Nos. 21, 22, 23, 40] |
| Defendant | |

Defendant Skillz Inc. operates a mobile gaming platform, hosting several games in which users compete for money and prizes. The plaintiffs in this case are all former users of Skillz's "21 Blitz" game. They raise a host of claims arising out of their use of Skillz's mobile app, including allegations that Skillz operates an illegal online casino.[1] Skillz moves to compel arbitration of the plaintiffs' claims according to their game's Terms of Service and to dismiss the plaintiffs' declaratory-judgment claims.[2] One plaintiff moves for a preliminary injunction, requesting that I enjoin Skillz from advertising in her home state.[3] Because (1) the plaintiffs agreed to the Terms of Service by creating accounts in Skillz's app and (2) the arbitration agreement in the Terms of Service is valid and enforceable, I grant Skillz's motion to compel arbitration and deny as moot its motion to dismiss. I also deny the motion for a preliminary injunction because the moving plaintiff has not shown that an injunction is necessary to preserve her arbitrable claims.

---

[1] *See* ECF No. 11.

[2] ECF Nos. 22, 23.

[3] ECF No. 21.

**Background**

Skillz operates several mobile phone games, including 21 Blitz, a solitaire-style game that borrows rules from blackjack.[4]  Skillz's platform allows users to play this game in head-to-head matches against other users for cash prizes.  If users want to join these competitions, they are required to register and save an account.[5]  When saving their accounts, users encounter this screen:



The text directly below the "Next" button reads, "By tapping 'Next,' I agree to the Terms of Service and the Privacy Policy" and is hyperlinked to bring users to the full text of Skillz's

---

[4] ECF No. 11 at 5–7.

[5] ECF No. 22-2 at 2.

Terms of Service and Privacy Policy.[6]  The first provision of the Terms of Service states, in all capital letters, that all claims "arising out of or relating to" Skillz's Terms of Service or its software must be resolved through arbitration.[7]  This opening provision references Section 14 of the Terms, which provides details about resolving disputes via arbitration.[8]  All three plaintiffs registered accounts on Skillz's platform, and therefore were required to view the screen described above.[9]

The plaintiffs all played 21 Blitz with varying levels of success.[10]  Alyssa Ball and John Prignano were quite successful, both competing for and winning significant sums of money. After accusing other players of cheating, Ball and Prignano were locked out of their Skillz accounts.  They sued Skillz under several fraud theories, alleging that Skillz violated its anti-cheating policy by not reimbursing money lost against known cheaters and not paying out certain prizes that were promised.[11]  After seeing news coverage of Ball and Prignano's complaint, plaintiff Jane Roe[12] contacted Ball and Prignano's counsel, asking to be added to the lawsuit. Roe had seen advertisements for 21 Blitz that touted the game as an easy way to make extra money.[13]  She started playing the game, and in seven months she had lost more than $60,000.[14]

---

[6] ECF No. 11 at 19–20; ECF No. 22-2 at 3.

[7] ECF No. 22-5 at 2.

[8] *Id.* at 16–18.

[9] ECF No. 11 at 19–20; ECF No. 22-2 at 4–5.

[10] ECF No. 11 at 8–13, 17–19.

[11] ECF No. 1.

[12] Jane Roe moved to proceed under a fictitious name, ECF No. 10, but that motion has been denied, ECF No. 39.  But because the order denying her motion did not require her to reveal her true name until after the court resolved the pending motion to dismiss, I refer to that plaintiff in this order by her fictitious name.

[13] ECF No. 11 at 17.

[14] *Id.*

She alleges that 21 Blitz triggered a gambling addiction that eventually led to her losing her life savings and becoming suicidal.[15]  The plaintiffs' amended complaint added Roe as a plaintiff, along with consumer-protection counts alleging that Skillz's advertisements fraudulently concealed the possibility that users would lose money playing its games.[16]

After the plaintiffs filed their amended complaint, Roe individually moved for a preliminary injunction.[17]  She requests that the court enjoin Skillz's advertising in her home state of Colorado because the trauma she suffered as a result of losing so much money playing 21 Blitz is re-triggered every time she sees one of Skillz's ads.  For its part, Skillz moves to compel arbitration under the Terms of Service[18] and to dismiss the plaintiffs' claims for declaratory judgments.[19]

## Discussion

**A.    Skillz's Motion to Compel Arbitration [ECF No. 22]**

The Federal Arbitration Act (FAA) states that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy" arising out of the contract or transaction "shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract."[20]  The FAA permits any party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written

---

[15] *Id.* at 17–18.

[16] *Id.* at 18–19.

[17] ECF No. 21.

[18] ECF No. 22.

[19] ECF No. 23.

[20] 9 U.S.C. § 2.

agreement for arbitration" to petition any federal district court for an order compelling arbitration in the manner provided for in the arbitration agreement.[21]

Congress enacted the FAA nearly 100 years ago "to 'reverse centuries of judicial hostility to arbitration agreements . . . by placing arbitration agreements 'upon the same footing as other contracts.'"[22]  The FAA "establishes a federal policy favoring arbitration, requiring that [courts] rigorously enforce agreements to arbitrate"[23] and provides "'that where [a] contract contains an arbitration clause, there is a presumption of arbitrability.'"[24]  "By its terms, the Act 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'"[25]

The district court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."[26]  In answering these questions, the court must "interpret the contract by applying general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration."[27]  The party seeking to compel arbitration has the burden to show that both of these

---

[21] *Id.* at § 4.

[22] *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 225–26 (1987) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510 (1974)) (internal citation and alteration marks omitted).

[23] *Id.* at 226 (internal quotation marks omitted).

[24] *Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277, 1284 (9th Cir. 2009) (quoting *AT&T Techs, Inc v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).

[25] *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir.2000) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original)).

[26] *Id.*

[27] *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996).

questions must be answered in the affirmative.[28]  "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms."[29]

The plaintiffs do not dispute that their claims fall within the scope of the agreement. They instead attack the agreement's validity, arguing first that they never affirmatively agreed to the Terms of Service by clicking the "Next" button when registering their accounts.  They also argue that the arbitration agreement is procedurally and substantively unconscionable and that, because the Terms of Service were not supported by lawful consideration, the agreement is wholly invalid, and the arbitration provision should not be enforced.

### 1.    *The plaintiffs agreed to the Terms of Service.*

The plaintiffs first argue that they are not bound by the Terms of Service because they did not agree to it when they signed up.[30]  They contend that there is no mutual assent to support formation of a contract, so they are not bound by the Terms.[31]

"In the context of online agreements, the existence of mutual assent turns on whether the consumer had reasonable notice of the terms of service agreement."[32]  Courts have recognized two forms of online user agreements.  In "browsewrap" agreements, a website owner seeks to bind users to terms and conditions by posting them somewhere on the website, usually accessible through a hyperlink.[33]  Websites using browsewrap agreements usually post a statement

---

[28] *Nguyen v. Barnes and Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).

[29] *Chiron Corp.*, 207 F.3d at 1130.

[30] ECF No. 27 at 11–14.

[31] *Id.*

[32] *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019).

[33] *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014).

somewhere on the site that users are bound by these terms simply through continued use.[34]  In contrast, a "clickwrap" agreement requires users to expressly manifest assent, often by clicking an "I accept" button after being forced to view the terms of service.[35]  Because clickwrap agreements generally do a better job of placing users on notice of the terms and provide an opportunity for users to review them before continuing to use a website, courts are more likely to enforce them over browsewrap-style agreements.[36]  But regardless of the categorization of the agreement at issue, the most important question is whether the notice given was sufficient. [37]

The Skillz agreement falls somewhere between browsewrap and clickwrap:  users do not have to take an extra step to acknowledge the agreement before creating their accounts, but Skillz does not attempt to bind users with a passive statement about the existence of the terms either.[38]  Courts have found that this type of hybrid agreement gives proper notice to consumers if (1) the hyperlink to the terms is close to the button that users must interact with and (2) users are given a reasonable opportunity to read the terms and understand the consequences of their assent before clicking through.[39]  When a user signs up for a Skillz account, she is prompted to

---

[34] *Id.*

[35] *Id.*

[36] *Id.* at 1176.

[37] *Fagerstrom v. Amazon, Inc.*, 141 F. Supp. 3d 1051, 1068 n.6 (S.D. Cal. 2015), *aff'd sub nom. Wisely v. Amazon, Inc.*, 709 Fed. App'x 862 (9th Cir. 2017) (holding that users had sufficient notice of Amazon's Conditions of Use, which was hyperlinked in the text directly below the "Place Your Order" button).

[38] An example of a browsewrap agreement in a mobile-phone game is seen in *Wilson v. Huuuge, Inc.*, 944 F.3d at 1220.  In *Wilson*, a mobile game developer never notified its users that it had terms of service and buried a link to them in the game's settings, where users were unlikely to find it.  *Id.*  The Ninth Circuit refused to bind users to terms that they had to "seek out or stumble upon."  *Id.*  The facts here are nothing like those in *Wilson*.

[39] *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837–41 (S.D. N.Y. 2012) (collecting cases and finding that Facebook's Terms of Use, which were linked below the "Sign Up" button, were

enter her birthday and tap "Next."  The text below the "Next" button reads, "By tapping 'Next,' I agree to the Terms of Service and the Privacy Policy."  This text is hyperlinked to the Terms of Service.  The text is immediately underneath the "Next" button, and the user doesn't have to scroll to see it.  It is in a contrasting color from the background, making it stand out when looking at the screen.  The user is therefore "informed of the consequences of [her] assenting click and [is] shown, immediately below, where to click to understand those consequences."[40] This is enough to bind the plaintiffs to the Terms of Service.

The plaintiffs argue that it is not enough that Skillz notified users of the consequences of hitting "Next" and provided a link to explain those consequences; to be enforceable, any online user agreement must be a pure clickwrap agreement.  The law, however, does not so hold.  True, the cases that the plaintiffs cite to support this notion all relied on the presence of this step to hold that the agreements were enforceable.  But none of those cases *required* that extra step.  For example, in *Petrie v. GoSmith, Inc.*, the District of Colorado upheld an agreement in which the plaintiff checked a box next to an advisory with a hyperlink to the terms on a different page.[41] Nothing in that case states that having the check-box next to the advisory saved the agreement, and the court even noted that all that courts "routinely" uphold online agreements as long as the website owner provided reasonable active or constructive notice of the terms and the user manifested assent to them.[42]  Just because courts approved one method of obtaining assent to online agreements does not mean that any other method is invalid.  While an additional step

---

enforceable because a reasonably prudent user would see the notice and review the terms before proceeding).

[40] *Id*. at 840.

[41] *Petrie v. GoSmith, Inc.*, 360 F. Supp. 3d 1159, 1163 (D. Colo. 2019).

[42] *Id.* at 1161.

1 would provide additional notice to users that there were consequences to signing up for a Skillz

2 account, plaintiffs have not shown that the law required that step.  I find that the plaintiffs here

3 were given sufficient constructive notice of the Terms of Service and manifested assent to it by

4 tapping the "Next" button in the sign-up process.

5        **2.**     ***The arbitration agreement is not unconscionable.***

6        The plaintiffs next argue that, even if they had agreed to be bound by the Terms of

7 Service, the arbitration agreement is unenforceable because it is unconscionable.[43]  "Generally,

8 both procedural and substantive unconscionability must be present . . . for a court to exercise its

9 discretion to refuse to enforce a clause as unconscionable."[44]

10        **a.**     ***Procedural unconscionability***

11        "An arbitration clause is procedurally unconscionable when a party has no 'meaningful

12 opportunity to agree to the clause terms either because of unequal bargaining power, as in an

13 adhesion contract, or because the clause and its effects are not readily ascertainable upon a

14 review of the contract.'"[45]  The plaintiffs argue that the agreement is procedurally

15 unconscionable because it is a "prototypical" adhesion contract.[46]  An adhesion contract is a

16 "standardized contract form offered to consumers of goods and services essentially on a 'take it

17 or leave it' basis, without affording the consumer a realistic opportunity to bargain, and under

18 such conditions that the consumer cannot obtain the desired product or service except by

19

20

21

---

22 [43] ECF No. 27 at 14–19.

[44] *D.R. Horton, Inc. v. Green*, 96 P.3d 1159, 1162 (Nev. 2004).

23 [45] *Gonski v. Second Jud. Dist. Court*, 245 P.3d 1164, 1169 (Nev. 2010).

[46] ECF No. 27 at 18.

9

acquiescing to the form of the contract."[47]  The "distinctive feature" of adhesion contracts is that the party being offered the contract has "no choice as to its terms."[48]

The Skillz agreement is an adhesion contract.  The plaintiffs, when attempting to use Skillz's service, were presented with a stock form contract that they had no choice but to accept if they wanted to continue to use Skillz's app.  Skillz argues that the plaintiffs still had a meaningful choice about whether to accept the Terms of Service—if they didn't agree with the Terms, they were free to reject Skillz's offer and seek entertainment elsewhere.[49]  But the inquiry here is not whether the plaintiffs were able to play a different game if they didn't want to accept Skillz's terms; the focus is instead on whether the plaintiffs were in a position to negotiate the contract's terms.  And the way the agreement was presented to the plaintiffs gave them no meaningful choice about the contract's terms.  So, the agreement is procedurally unconscionable.

### b.   Substantive unconscionability

But to avoid enforcement of the arbitration agreement, the plaintiffs also need to show that the agreement is substantively unconscionable.  Substantive unconscionability focuses on whether an agreement's terms are one-sided or bilateral.[50]  The plaintiffs' sole argument here is that the agreement is substantively unconscionable because it requires the parties to split the fees and costs.[51]  Arbitration agreements that require the parties to split fees are substantively unconscionable,[52] and the agreement here does just that.  However, the agreement also contains a

---

[47] *Obstetrics & Gynecologists William G. Wixted, M.D., Patrick M. Flanagan, M.D., William F. Robinson, M.D. Ltd. v. Pepper*, 693 P.2d 1259, 1260 (Nev. 1985).

[48] *Id.*

[49] ECF No. 36 at 8.

[50] *D.R. Horton, Inc.*, 96 P.3d at 1162–63.

[51] ECF No. 27 at 16–17.

[52] *Ting v. AT&T*, 319 F.3d 1126, 1151 (9th Cir. 2003).

severability provision, stating that if any provision is held unenforceable, that provision would be ineffective without affecting the rest of the Terms of Service.[53]  This clause preserves the parties' agreement to arbitrate because the provision splitting fees is collateral to the clause compelling arbitration.[54]  With this provision severed from the remainder of the arbitration agreement, there is no other apparent substantive unconscionability.  And because the plaintiffs need to show that the agreement was both procedurally and substantively unconscionable to avoid enforcement, their argument that the arbitration agreement was unconscionable fails.

### 3.     *Whether the Terms of Service agreement is invalid is a question for the arbitrator.*

The plaintiffs' final argument against enforcement of the arbitration agreement is that there is no legal consideration supporting the Terms of Service, rendering the entire agreement— arbitration provisions included—invalid.[55]  Skillz responds that the plaintiffs' argument goes to the validity of the contract as a whole, so it should be resolved by the arbitrator under the principles articulated in *Buckeye Check Cashing, Inc. v. Cardegna*.[56]

In *Buckeye*, the United States Supreme Court considered an appeal from the Florida Supreme Court's decision that a defendant's motion to compel arbitration should have been denied.  The plaintiff brought a class action alleging that Buckeye was charging usurious rates under a "Deferred Deposit and Disclosure Agreement."[57]  The High Court explained that

---

[53] ECF No. 22-5 at 19.

[54] *Linebarger v. Devine*, 214 P. 532, 534 (Nev. 1923).  *See also Cox v. Station Casinos, LLC*, 2014 WL 3747605 at *4–5 (D. Nev. June 25, 2014).

[55] ECF No. 27 at 19–25.

[56] ECF No. 36 at 12–14.

[57] *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).

challenges to the validity of arbitration agreements "upon such grounds as exist at law or

inequity for the revocation of any contract" fall into two categories.[58]  The first type "challenges

specifically the validity of the agreement to arbitrate."[59]  The second type "challenges the

contract as a whole, either on a ground that directly affects the entire agreement (e.g., the

agreement was fraudulently induced), or on the ground that the illegality of one of the contract's

provisions renders the whole contract invalid."[60]  The Court then noted that, "as a matter of

substantive federal arbitration law, an arbitration provision is severable from the remainder of the

contract" and, "unless the challenge is to the arbitration clause itself, the issue of the contract's

validity is considered by the arbitrator in the first instance."[61]  It ultimately held that the case was

arbitrable because the plaintiffs' challenge was to the contract as a whole rather than to the

arbitration provisions specifically.[62]

Here, the plaintiffs allege that the arbitration agreement is invalid because the illegality of

Skillz's operation rendered the entire Terms of Service *void ab initio*.[63]  The plaintiffs attempt to

couch this challenge as one specific to the arbitration agreement in their response to Skillz's

motion.  At bottom, however, it is a challenge to the validity of the entire contract, which, under

*Buckeye*, should be resolved in arbitration.  Much like in *Buckeye*, where the plaintiffs argued

that there was no enforceable contract because the benefit provided was an illegal, usurious loan,

the plaintiffs here argue that the Terms of Service (including the arbitration agreement) are void

---

[58] *Id.* at 444.

[59] *Id.*

[60] *Id.*

[61] *Id.* at 445–46

[62] *Id.* at 444, 446.

[63] ECF No. 11 at 34.

1  because the benefit provided was access to an illegal gambling platform.  Under *Buckeye*, the

2  plaintiffs' challenge to the legality of the contract must be resolved in arbitration.

3      Because the plaintiffs have failed to show that the arbitration agreement is not valid, I

4  must enforce it.  Having found that the arbitration agreement is valid with the fee-splitting

5  provision severed, I can either stay the case pending the arbitration or dismiss it without

6  prejudice.[64]  Because all of the plaintiffs' claims fall within the agreement's scope, I dismiss this

7  action without prejudice and order the parties to arbitrate the plaintiffs' claims in accordance

8  with their agreement, minus the severed fee-splitting provision.[65]

9  **B.    Jane Roe's Motion for a Preliminary Injunction [ECF No. 21]**

10     Skillz argues that I should not grant Roe's motion for a preliminary injunction if I grant

11  its motion to compel arbitration.  It contends that, because the parties agreed to arbitrate their

12  claims, questions of interim relief should be resolved by the arbitrator.[66]  In response, Roe only

13  incorporates her arguments against the motion to compel.[67]

14     "[A] district court may issue interim injunctive relief on arbitrable claims if interim relief

15  is necessary to preserve the status quo and the meaningfulness of the arbitration process . . . ."[68]

16  Roe's requested injunction is not necessary to preserve the status quo—in fact, as a mandatory

17  injunction it would it would upset the status quo—and she presents no argument about whether

18  the injunction would preserve the meaningfulness of the arbitration process.  Moreover, a ruling

---

20  [64] 9 U.S.C. § 3; *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 638 (9th Cir. 1988).

21  [65] Because I dismiss all of the plaintiffs' claims based on the arbitration agreement, I deny as moot Skillz's motion to dismiss the declaratory-judgment claims.

22  [66] ECF No. 28 at 12–14.

     [67] ECF No. 35 at 6–7.

23  [68] *Toyo Tire Holdings of Am. Inc. v. Continental Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010).

1  on the preliminary injunction would "reclaim for the judiciary a matter assigned by the parties to

2  arbitration" by prejudging the question at the center of Roe's claims against Skillz.[69]

3       Roe does not dispute that the applicable arbitration rules would allow her to seek a

4  preliminary injunction from the arbitrator,[70] and she has not shown that the injunction is

5  necessary to preserve her arbitrable rights.  So, I deny her motion for a preliminary injunction

6  without prejudice to her ability to renew her request for such relief before the arbitrator.

7  **C.    Jane Roe's Objection to the Magistrate Judge's Order [ECF No. 70]**

8       When Jane Roe joined this case, she sought permission to proceed under a fictitious name

9  and to seal the certificate of interested parties.[71]  Last month, Magistrate Judge Brenda Weksler

10  denied both motions.[72]  She ordered Roe to amend her complaint using her true name within

11  fourteen days after the motion to dismiss was resolved, at which time the certificate of interested

12  parties would be unsealed.  Roe objects to this order, arguing that the magistrate judge erred in

13  denying her motions because she is entitled to proceed anonymously to avoid personal

14  embarrassment.[73]

15       Federal Rule of Civil Procedure 72(a) allows a district court judge to modify or set aside

16  a magistrate judge's nondispositive ruling when it is "clearly erroneous or . . . contrary to law."[74]

17  A finding is clearly erroneous "when, although there is evidence to support it, the reviewing

18

---

19  [69] *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 912 (N.D. Cal. 2020) (citing *Simula, Inc. v. Autoliv,*

20  *Inc.*, 175 F.3d 716, 725–26 (9th Cir. 1999)).

    [70] ECF No. 28 at 13 n.5 (citing the American Arbitration Association's Commercial Arbitration

21  Rule 37(a) and 38)).

    [71] ECF Nos. 10, 13.

22  [72] ECF No. 39.

23  [73] ECF No. 40.

    [74] Fed. R. Civ. P. 72(a).

court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[75]  "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law[,] or rules of procedure."[76]

In her objection, Roe argues that the magistrate judge erred by not considering Roe's personal embarrassment she might feel if forced to reveal her true name.  But the magistrate judge took Roe's personal concerns about embarrassment into account before ultimately denying Roe's motions.[77]  She otherwise laid out the correct legal standard and explained how Roe failed to meet it, and she made no apparently mistaken legal findings in reaching that conclusion.  Roe points to no other alleged misapplication of law or erroneous factual finding that would allow me to sustain her objection to the magistrate judge's order.  Roe therefore fails to show how the order was clearly erroneous, so I overrule her objection.

## Conclusion

IT IS THEREFORE ORDERED that defendant Skillz's motion to compel arbitration **[ECF No. 22] is GRANTED** and **this action is DISMISSED** without prejudice to the plaintiffs' ability to arbitrate their claims in compliance with the arbitration agreement, minus the agreement's fee-splitting provision.

IT IS FURTHER ORDERED that plaintiff Jane Roe's motion for a preliminary injunction **[ECF No. 21] is DENIED** and defendant Skillz's motion to dismiss **[ECF No. 23] is DENIED as moot**.

---

[75] *Waterfall Homeowners Ass'n v. Viega, Inc.*, 283 F.R.D. 571, 575 (D. Nev. 2012) (quoting *Rafon v. Patchogue-Medford Sch. Dist.*, 2009 WL 789440 at *12 (E.D.N.Y. Mar. 20, 2009)) (internal quotation marks omitted).

[76] *Id.*

[77] ECF No. 39 at 2 (sympathizing with Roe's psychological issues and acknowledging her fears of personal and professional ramifications if her name were to be revealed).

IT IS FURTHER ORDERED that Roe's objection to the order denying her motions to proceed under a fictitious name and to seal the certificate of interested parties **[ECF No. 40] is OVERRULED.  The Clerk of Court is directed to unseal the certificate of interested parties [ECF No. 12] <u>on November 25, 2020</u>, and CLOSE THIS CASE.**

Dated: November 11, 2020

_____
U.S. District Judge Jennifer A. Dorsey

16